**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MINARD RUN OIL COMPANY,               )
PENNSYLVANIA OIL AND GAS              )
ASSOCIATION, ALLEGHENY FOREST         )
ALLIANCE, and WARREN COUNTY,          )
                                      )
                                      )
                   Plaintiffs,        )
        v.                            )        C.A. No. 09-125 Erie
                                      )        Judge McLaughlin
                                      )
UNITED STATES FOREST SERVICE,         )
*et al.*,                             )
                                      )
                   Defendants.        )

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

**INTRODUCTION**

      Presently pending before the Court is a Motion for Preliminary Injunction filed on behalf of Plaintiffs Minard Run Oil Company, the Pennsylvania Oil and Gas Association ("POGAM"), the Allegheny Forest Alliance ("AFA"), and County of Warren, Pennsylvania (collectively "Plaintiffs"). In this action, Plaintiffs seek to enjoin the United States Forest Service's implementation of the terms of a settlement agreement ("Settlement Agreement") reached between the United States Forest Service ("Forest Service"), the Forest Service Employees for Environmental Ethics ("FSEEE"), and the Sierra Club in Forest Service Employees for Environmental Ethics v. U.S. Forest Service, 08-cv-323-SJM (W.D.Pa. May 12, 2009) ("FSEEE"). Pursuant to the Settlement Agreement, the Forest Service agreed, in part, to analyze all future drilling proposals on split mineral estates in the ANF pursuant to the National Environmental Policy Act ("NEPA") prior to issuing Notices to Proceed.

Plaintiffs contend that the Settlement Agreement and its subsequent implementation by Leanne Marten ("Marten"), the current Forest Supervisor for the Allegheny National Forest ("ANF"), which requires the application of NEPA to the processing of "Notices to Proceed" ("NTPs") in connection with the exercise of privately held oil and gas rights in the ANF, is both substantively contrary to law and procedurally deficient. Plaintiffs further contend that they are suffering irreparable harm as a result of the Forest Service's refusal, with the exception of a handful of grandfathered wells, to permit access to privately held mineral rights in the ANF since January of 2009. They characterize the Settlement Agreement as a dramatic and arbitrary change in the manner in which the Forest Service and oil and gas drillers had historically interacted in the ANF in dealing with issues concerning private mineral rights.

The Forest Service counters that it retains the power to reasonably regulate the exercise of private oil and gas rights in the ANF and that the application of NEPA to individual oil and gas drilling requests, including the present ban on drilling, represents a reasonable and lawful exercise of the Forest Service's regulatory authority and stewardship of the ANF.

Defendants initially assert a jurisdictional challenge to Plaintiffs' action. Specifically, they contend that each Plaintiff has failed to prove a demonstrable injury in fact as a result of the actions taken by the Forest Service and, therefore, lack standing. They also contend that the action is essentially premature in that there has been no "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*. ("APA").[1]

A hearing on the Plaintiffs' request for a preliminary injunction was conducted on August 24th through August 26th, 2009. Post-hearing submissions were filed by the parties on September 22nd and 23rd, 2009. The following represents the Court's Findings of Fact and Conclusions of Law.

---

[1] The Defendants raised their jurisdictional challenge in a Motion to Dismiss. However, in a pre-hearing conference, I concluded that it was most appropriate to address the jurisdictional challenge on a more fully developed record after the hearing. (Hearing, July 29, 2009, pp. 118-19).

## FINDINGS OF FACT

### A)  The Parties

1.   Plaintiff Minard Run Oil Company ("Minard Run") is a Pennsylvania corporation headquartered in Bradford, Pennsylvania.  Minard Run is in the business of crude oil and natural gas drilling and production, operating primarily in western Pennsylvania. (Complaint ¶ 1).  Minard Run is the owner of various oil and gas interests in the ANF.

2.   Plaintiff POGAM is a Pennsylvania non-profit organization headquartered in Harrisburg, Pennsylvania.  POGAM is a trade association comprised of Pennsylvania's independent oil and gas producers and serves to promote the interests and general welfare of Pennsylvania's crude oil and natural gas industry.  (Complaint ¶ 2).  The membership of POGAM consists of oil and gas drillers, producers and refiners who own or lease oil and gas interests in the ANF or who rely upon oil and gas from the ANF in their business.

3.   Plaintiff AFA is a Pennsylvania non-profit with its principal place of business located in Kane, Pennsylvania.  AFA is a coalition of public school districts, municipalities, and businesses that have interests connected to the ANF and which rely upon multiple-use management of the ANF's resources.  (Complaint ¶ 3).

4.   Plaintiff County of Warren, Pennsylvania ("Warren County") is a governmental entity located in northwestern Pennsylvania.  Warren County is one of four Pennsylvania counties in which the ANF is located.  (Complaint ¶ 4).

5.   Defendant Forest Service is an agency of the United States Department of Agriculture. (Complaint ¶ 5).  The Forest Service is the owner of the surface estate of the land comprising the ANF.

6.   Defendant Abigail R. Kimbell is the Chief of the Forest Service.  Defendant Kent P. Connaughton is the Regional Forester of the Eastern Region of the Forest Service.  The ANF is within the supervisory authority of both Kimbell and Connaughton.  (Complaint

¶¶ 6-7).  Defendant Marten is the current Forest Supervisor of the ANF, having held that position since January, 2008.  (Complaint ¶ 8; Transcript p. 318).

7.    Defendant Eric H. Holder is the Attorney General of the United States and the head of the U.S. Department of Justice.  Attorney General Holder has control over the conduct of litigation involving the United States, including the authority to settle claims against the same.  (Complaint ¶ 9).

8.    Defendant FSEEE is a non-profit corporation headquartered in Eugene, Oregon. (Complaint ¶ 10).

9.    Defendant ADA is a Pennsylvania non-profit corporation headquartered in Kane, Pennsylvania.  (Complaint ¶ 11).

10.   Defendant Sierra Club is a national non-profit organization principally located in San Francisco, California.  (Complaint ¶ 12).


## B) Treatment of Split Estates in the ANF Prior to the Settlement Agreement

11.   In 1859, Colonel Edwin L. Drake struck oil in the Allegheny Plateau region of Pennsylvania, pioneering a new method of oil extraction that would eventually lead to rapid oil and gas development throughout the Allegheny Plateau and world-wide.

12.   Prior to the start of the 20th century, the vast majority of lands comprising the ANF were privately owned and subject to state property laws.  Beginning in 1891, Congress began to authorize federal acquisition of lands suitable for timber production and watershed protection in order to ensure a continuous national supply of these valuable resources.  See 16 U.S.C. § 471, 26 Stat. 1103 (repealed); 16 U.S.C. § 475.  In order utilize limited funds to acquire as much acreage for timber and watershed management as possible, the National Forest Reservation Commission deliberately sought to purchase large tracts of surface estate without acquiring the valuable mineral rights contained therein.

4

13.    The 1911 Weeks Act established funding and procedures for acquiring the privately held property interests that became the ANF and other eastern national forests.  16 U.S.C. §§ 511-21.  The government acquired the vast majority of ANF surface estates prior to 1937. (Mayer Decl. ¶¶ 31, 40).   The ANF, part of the Eastern Region of the National Forest System, was established by presidential proclamation in 1923. 43 Stat. 1925 (1923).

14.    As a result of the federal government's decision to forgo the acquisition of mineral rights, over 93% of the mineral estates in the ANF are privately owned.  (Id).  These private mineral estates exist in two distinct categories:  "reserved" mineral rights, and "outstanding" mineral rights.

15.    Reserved mineral rights were created when the fee owner transferred the surface estate to the federal government and retained the mineral estate.  Approximately 48% of the mineral estates in the ANF are "reserved" estates.  (U.S. Forest Service, July 2009 ANF Draft Supplemental Environmental Impact Statement ("SEIS"), Plaintiffs' Ex. S-46, App. C,  p. 1).  Under the Weeks Act, reserved private mineral rights are subject to federal control only to the extent set forth in "rules and regulations . . . expressed in the written instrument of conveyance."  16 U.S.C. § 518.

16.    Reserved mineral rights are categorized by the set of Secretary of Agriculture Rules and Regulations in effect at the time of federal acquisition and are typically referred to as 1911, 1937, 1947 or 1963 reserved rights.  (U.S. Forest Service, July 2009 ANF Draft SEIS, Plaintiffs' Ex. S-46, App.C,  p. 1). The vast majority of the reserved mineral estates in the ANF are "1911 reserved rights."  These typically incorporate the following standard seven paragraph version of rules adopted by the Secretary of Agriculture in 1911 in the instruments of conveyance relative to those mineral estates:

1.    Every person claiming the right to prospect for minerals, oil or gas, or the products thereof, or to mine, drill, develop or operate in or upon lands acquired by the United States under the provisions of the Act of March 1, 1911 (36 Stat. 961), with a reservation to the grantor of mineral rights, including oil and gas, must, on demand,

exhibit to the Forest Officer in charge satisfactory written evidence of the right or authority from, through or under the said grantor.

2.  In prospecting for, and in mining and removing minerals, oil and gas, and in manufacturing the products thereof, only so much of the surface shall be occupied, used or disturbed as is necessary for the purpose.

3.  In underground operations all reasonable and usual precaution shall be made for the support of the surface and to that and tunnels, shafts and other working shall be subject to inspection and examination by the Forest Officers, Mining Experts or Inspectors of the United States.

4.  Payment of the usual rates charged in the locality for sales of National Forest timber, and timber products of the same kind or species shall be made to the United States for all timber, undergrowth or young growth, cut, destroyed or damaged in prospecting, mining, drilling or removing minerals, oil or gas, or in manufacturing products therefrom, and in the location and construction of buildings or works of any kind for use in connection therewith.  All slash resulting from such cutting or destruction shall be disposed of as directed by the Forest Officer, when inflammable in his judgment.  No timber, undergrowth or reproduction shall be unnecessarily cut, destroyed or damaged.

5.  All buildings, camps, equipment and other structures shall be removed from the Forests within six months after the completion or abandonment of the operations, otherwise such buildings, camps, equipment and other structures shall become the property of the United States.

6.  All destructible refuse caused by the operations hereunder, which interferes with the administration of the forest growth shall, within six months after the completion of said operations, be disposed of.

7.  While operations are in progress, the operators, contractors, subcontractors and employees of contractors and subcontractors at work on the National Forest shall use due diligence in the prevention and suppression of fires, and shall be available for service in the extinguishment and suppression of all fires within the particular locality.

(Mayer Decl., ¶ 37).  These deeds do not require a "permit" for "surface use, occupancy or disturbance."  (1984 ANF Handbook, Ch. 1, p.3; Ch. 2, p. 14).

17.  The July 2009 ANF Draft SEIS reiterates that "[t]he major difference[] between the 1911 rules and regulations and the others are that the 1911 do not require a permit, bond or reclamation."  (U.S. Forest Service, July 2009 ANF Draft SEIS, Plaintiffs' Ex. S-46, App.C,  p. 1).

18.  Outstanding mineral rights, on the other hand, were created when the surface estate and the mineral estate were severed from one another in a transaction between private parties prior to the federal government's acquisition of the surface estate.  Federal purchase of surface estates subject to outstanding mineral rights took place pursuant to a 1913 amendment to

the Weeks Act authorizing such acquisitions.  37 Stat. 828, 855 (1913).  Approximately

52% of the private oil and gas mineral estate in the ANF are outstanding estates.  (U.S.

Forest Service, July 2009 ANF Draft SEIS, p. 1).

19.     With regards to outstanding estates, the 1984 ANF Handbook provides three examples of

the language used in a typical deed to severe the mineral and surface estate:

**Example: Typical Deeds on the ANF**

When the Forest Service began to acquire land, much of the oil, gas and minerals were
owned by operators by right of severance conveyances made before the turn of the century.
Under these exceptions, the subsurface was separated from the surface by wording within
deeds, such as the following:

1.     Excepting and reserving from the operation of this conveyance and out of the
premises hereinbefore described, all of the petroleum oil, gas, and minerals, in,
under and upon and which may be produced from said premises; also, all oil wells
and gas wells with their equipment, lines, etc., and buildings, structures and
dwellings used in connection herewith, at the present time located on said premises;
together with the right to enter there-on at all times for the purpose of drilling,
mining, exploring for and producing, removing and transporting such petroleum oil,
gas, mineral, and water; and also the right to erect, maintain, repair and remove
such houses and other buildings on said premises as may be required for the use of
the employees engaged in any of such operations.

2.     Also excepting and reserving from the lands hereby conveyed to the said party of
the first part, its successors and assigns, all oil, gas and minerals lying and being in
and under the said two tracts of land above, described with the right to the party of
the first part, its successors and assigns, to at all times enter upon said lands for the
purpose of drilling, boring, mining and operating for the production of oil, gas and
minerals with the right to erect and maintain all derricks, buildings, tanks, and
structures necessary or convenient for the purpose of mining for, producing, storing
and transporting oil, gas, minerals and water to, from over and across the premises
with the right to lay, maintain, keep, repair and remove all necessary oil lines, gas
lines, steam lines and water lines for the transportation of oil, gas and minerals and
water and steam in, through, over and across said premises.  The party of the second
part further covenants and agrees for himself and all persons claiming under him
that in cutting and removing the timber and bark on the lands above described he
will do the same in such manner as not to injure the wells, rigs, pipelines and steam
boxes of the party of the first part of those claiming under it and that he will in
cases of any such injury, promptly pay to the party of the first part or those claiming
under it the whole amount f the damage occasioned by such injury.

3.     Excepting and reserving from the force and effect of this conveyance, all the oil and
gas in, on, under or upon said several tracts, parcels or lots of land and every part
and parcel thereof, together with the right of ingress, egress, and regress in and to
and from and upon the same and every part and parcel thereof to said first parties,
their heirs, executors, administrators, lessees, vendors and assigns, with the right

7

to drill, dig, bore, obtain, store, transport and remove any and all oil or gas, in or under the same and the right to do in the ordinary manner all things usual, necessary and proper to be done, to have the full and proper use of this reservation and the full benefit and enjoyment thereof and also the right to have and use timber and wood for drilling, for rigs or fuel if such be then on the land.

(1984 ANF Handbook, Ch. 1, p. 15).

20.     The respective property rights of the ANF surface owner and the private owners of outstanding mineral rights were addressed in United States v. Minard Run Oil Co., 1980 U.S. Dist. Lexis 9570 (W.D. Pa. 1980).  In Minard Run, the court held that the owner of mineral rights had an "unquestioned right" to enter the property to access and extract his minerals.  Id. at *13.  Recognizing that the owner of the dominant estate had an obligation to reduce unnecessary disturbance of the surface estate, the Court prescribed what it characterized as "minor restrictions which . . . should not seriously hamper the extraction of oil and gas."  Specifically, the Court ordered oil and gas drillers to provide the following details "no less than 60 days in advance" of commencing drilling operations:

    (1) A designated field representative

    (2) A map showing the location and dimensions of all improvements including but not limited to well sites and road and pipeline accesses.

    (3) A plan of operations, of an interim character if necessary, setting forth a schedule for construction and drilling.

    (4) A plan of erosion and sedimentation control . . .

    (5) Proof of ownership of mineral title.

Id. at *19-20.

21.     The 1984 ANF Handbook provides guidance for Forest Service personnel in handling oil and gas proposals.  With respect to outstanding and reserved mineral rights, the Handbook incorporates each of the requirements set forth in Minard Run, including the requirement that the Forest Service receive 60 days advance notice from the oil and gas operators.  The

Handbook notes that those conditions "are now standard operating procedures on the ANF and in the Eastern Region of the USFS." (Plaintiffs' Ex. A-15).

22.     The 1984 ANF Handbook states that the "Forest Service is a resource-management agency, not a regulatory agency." (Plaintiffs' Ex. A-15, Ch. 1). The Handbook acknowledges that no permit is necessary for surface disturbance or occupancy under the 1911 Weeks Act regulations. (Plaintiffs' Ex. A-15).

23.     Chapter 2 of the Handbook states that "The Forest Service must review all proposals and prepare an Environmental Assessment of the surface disturbance activity regardless of mineral ownership." (Plaintiffs' Ex. A-15, Ch. 2). The Handbook makes no reference to preparation of an Environmental Impact Statement. (Plaintiffs' Ex. A-15).

24.     The Handbook contains a disclaimer that "direction provided by law, regulation, or the Forest Service Manual always takes precedence over direction in this Handbook." (Plaintiffs' Ex. A-15).

25.     The policies, practices and procedures of the Forest Service, including those relevant to oil and gas activities, are governed by the 1986 Allegheny National Forest Forest Plan. (Transcript pp. 248-49, 297-98). The 1986 Forest Plan was accompanied by an Environmental Impact Statement which was adopted through a public notice and comment procedure and which assessed the cumulative impacts of oil and gas activities on the ANF.[2] (Id.) In relevant part, the 1986 Forest Plan provides:

> Land management decisions must not preclude the ability of private mineral owners to make reasonable use of the surface, as defined by deed and public law. The Forest Service will protect the rights of the federal government, respect private mineral rights, and insure that private mineral owners and operators take

---

[2]     The EIS that accompanied the 1986 Forest Plan assessed the cumulative impacts of oil and gas activities in the ANF as they relate to the policies and practices underlying the Forest Service's land management and stewardship functions. That EIS did not serve as a precondition to individual oil and gas drilling activities or a bar to those activities proceeding. (Hearing, July 25, 2009, p. 91).

> reasonable and prudent measures to prevent unnecessary
> disturbance to the surface.
>
> Forest Service administration of outstanding and reserved mineral
> rights will be in accordance with deeds, mineral reservations, and
> state and federal laws.

(Plaintiffs' Ex. O).  The 1986 Forest Plan does not require a forest-wide EIS to be prepared pursuant to NEPA before private oil and gas projects may go forward.  (Transcript pp. 249-50).

26.     The 1990 Forest Service Manual, Chapter 2830, provides Forest Service personnel with "applicable direction in those situations where the United States does not own the minerals and/or rights to minerals underlying lands in the National Forest System." (Transcript p. 306; Plaintiffs' Ex. A-5).

27.     Subchapter 2830.1 states that reserved mineral rights are subject to "[t]he appropriate rules and regulations in effect at the time of the mineral reservation" which "were incorporated as part of the deed by which the United States acquired the surface." (Plaintiffs' Ex. A-5). The "specific terms of the deeds by which the surface and subsurface owners acquired their interests also provide the Forest Service authority to administer mineral reservations and outstanding mineral rights." (Id.)  The Manual acknowledges that "the Forest Service does not have authority to deny the exercise of a mineral reservation or outstanding mineral right."  (Id.)

28.     In 1992, Congress codified the directives set forth in Minard Run in § 2508 of the Energy Policy Act of 1992.  That provision requires the Forest Service to issue rules for private oil and gas estates in the ANF that are limited to the following terms and conditions:

> (2) The terms and conditions referred to in paragraph (1) shall require that
> reasonable advance notice be furnished to the Secretary of Agriculture at
> least 60 days prior to the commencement of surface disturbing activities.
>
> (3) Advance notice under paragraph (2) shall include each of the following
> items of information:
>     (A)  A designated field representative.

10

(B) A map showing the location and dimensions of all improvements, including, but not limited to, well sites and road and pipelines accesses.
(C) A plan of operations, of an interim character if necessary, setting forth a schedule for construction and drilling.
(D) A plan of erosion and sedimentation control.
(E) Proof of ownership of mineral title.

Nothing in subsection shall be construed to affect any authority of the State in which the lands concerned are located to impose any requirements with respect to such oil and gas operations.

30 U.S.C. §226(o), 106 Stat. 3108 (1992).

29.   From 1981 through approximately 2008, the Forest Service and oil and gas drillers relied upon the framework set forth in Minard Run to define their respective rights and obligations.  (Transcript p. 255).  After receiving a drilling proposal from a private operator, the Forest Service reviewed the proposed operating plan and conducted a brief analysis as to potential impact on the surface estate.  (Transcript p. 257).  The Forest Service would then work cooperatively with the drillers to address any concerns prior to issuing a "Notice to Proceed."  (Id.)  NTP's were issued by the Forest Service to acknowledge that they had reviewed the proposal and had no objections to the drilling project.  (Id.)

30.   Ernest Rozelle testified to his employment in the ANF as a "land staff officer" from 1986 to 1999.  (Transcript p. 254-55).  Rozelle's duties included oversight of oil and gas activities in the forest.  (Id. at 245-46).  Rozelle viewed Minard Run as "a landmark decision, which actually helped both the oil and gas operators and the Forest Service because it defined our roles."  (Id. at 255).

31.   Following Minard Run, the Forest Service developed a relationship of "cooperation" and "trust" with the private oil and gas industry operating in the ANF.  Activities in the ANF were managed on a "cooperative" basis.  (Transcript p. 246).  The Forest Service officials in the ANF also interacted continuously with Pennsylvania regulatory authorities. (Transcript pp. 246-248).

11

32.    During Rozelle's tenure, the Forest Service viewed the 60 day timeframe set forth in
       <u>Minard Run</u> as a target for completion of their analysis relative to individual drilling
       requests.  (Transcript p. 256).  In his experience, 90 to 95 percent of the drilling requests
       were processed within 60 days.  (<u>Id</u>.)

33.    Rozelle was unaware of the Forest Service ever applying NEPA to private oil and gas
       interests in the ANF and "viewed the Forest Service as a resource agency [rather than] a
       regulatory agency."  (Transcript p. 249-50, 257).

34.    David Fredley testified as to his employment with the Forest Service from 1981 through
       1997.  Fredley served as a mineral specialist in the Southern Region of the Forest Service,
       then held the position of Assistant Director for Minerals and Geology Management in the
       Washington Office of the Forest Service.  (Transcript p. 275).  In his capacity as a mineral
       specialist, Fredley was responsible for mineral management in 13 southeastern states, all
       containing National Forest land, the vast majority having been acquired pursuant to the
       1911 Weeks Act.  (Transcript pp. 276-77).  As Assistant Director for Minerals and
       Geology, Fredley was responsible for developing policies and management practices with
       regard to minerals estates on Forest Service land.  (<u>Id</u>.)

35.    During Fredley's tenure in the Southern Region, it was the Forest Service's position that
       NEPA did not apply to the oversight of privately held mineral estates on National Forest
       land.  (Transcript p. 277).

36.    While working in the Forest Service headquarters in Washington, Fredley assisted in the
       development of the 1990 Forest Service Manual in cooperation with the staff in the Office
       of General Counsel.  As noted previously, the Manual states that "the Forest Service does
       not have authority to deny the exercise of a mineral reservation or outstanding mineral
       right" and  makes no reference to the applicability of NEPA to the exercise of private
       mineral estates.  (Plaintiffs' Ex. A-5; Transcript p. 277-78).  (<u>Id</u>.)

37.     Fredley referenced examples of other National Forests in the United States where the Forest Service had taken the position that NEPA did not apply to the administration of private mineral activities.  (Transcript pp. 280-84).  For instance, the 2006 Land and Resource Management Plan for the Shawnee National Forest states that the "use of federal surface for [private] mineral activities shall be governed by the legal instrument, deed or similar conveyance document that identifies the reserved and outstanding rights.  Land management decisions must not preclude the ability of private mineral owners to make reasonable use of the surface as defined by deed and law." (Transcript p. 282).  Similarly, the Final Environmental Impact Statement and Revised Land and Resource Plan for the Ouachita National Forest in Oklahoma and Arkansas states that "Outstanding mineral rights are subject to the terms of the severance deed . . . [and] state law.  The Forest Service reviews the plan and negotiates the operation condition for mitigation of surface disturbance with the operator and has no recourse to disallow the project, except through acquisition of the mineral estate."  (Transcript pp. 282-83).

38.     During Fredley's tenure, he was unaware of any instance where the Forest Service attempted to preclude access to privately held mineral rights, either outstanding or reserved, during the pendency of a forest-wide EIS.  (Transcript p. 284).

39.     David Wright, a 38 year employee of the Forest Service and the Forest Supervisor of the ANF from 1987 through 1992, viewed the 60 day time frame set forth in Minard Run as "a commitment between [the Forest Service] and the industry to accomplish both of our needs during that time frame." (Transcript pp. 294-95, 303-04).  Wright's instruction to Forest Service officials during his tenure as Supervisor was to process mineral applications within 60 days or to "negotiate for more time . . . with the oil and gas operators."  During his tenure, "well over 90 percent" of drilling proposals were processed within 60 days. (Transcript p. 304).

40.     In 1991, Wright, in his capacity as ANF Supervisor, gave testimony at an Oversight Hearing before the Subcommittee on Energy and Environment of the U.S. House Committee on Interior and Insular Affairs.  (Transcript pp. 303-04; Plaintiffs' Ex. N). During the hearing, Wright explained to the Chairman of the Subcommittee the basis for the Forest Service's position that NEPA did not apply to the processing of individual private oil and gas proposals:

> MR. KOSTMAYER: Well, tell me how you implement the National Environmental Policy Act which you are charged with under the law in that particular area?
>
> MR. WRIGHT: The NEPA applies to all activities that we have in that area outside of oil and gas. . . . It does not apply to oil and gas operations.
>
> MR. KOSTMAYER: And what do you cite as your legal basis for that statement?
>
> MR. WRIGHT: Mr. Chairman, this issue – the circumstances surrounding . . . [these] third party operations are being looked at, explored right now by the attorneys for the USDA General Counsel. It is our position at this time that there is no Federal action that triggers a NEPA documentation for oil and gas operations with an outstanding right situation.
>
> MR. KOSTMAYER: So you do not believe that environmental impact statements are necessary for oil and gas drilling no matter how extensive in the national forest?
>
> MR. WRIGHT: Correct. . . .
>
> MR. KOSTMAYER: What is the basis for your view that NEPA does not apply?
>
> MR. WRIGHT: We must have a Federal action that really triggers for NEPA documents to kick in. And in this particular case, when a private mineral right owner exercises his constitutional right, that is not really a Federal action. We respond to that action that he takes and try to negotiate. . . . But it is being looked at right now, as I was advised by our attorneys. It appears at this time that it really does not apply.
>
> MR. KOSTMAYER: Well, the impact on the forest is not a Federal action?
>
> MR. WRIGHT: No, sir.

> MR. KOSTMAYER: Do you think you need more authority?
>
> MR. WRIGHT: No, sir.
>
> MR. KOSTMAYER: You do not?
>
> MR. WRIGHT: No, sir. I believe we have enough existing authority in our cooperation and partnerships with the state DER and the enforcement of the Clean Water Act.

(Plaintiffs' Ex. N, pp. 7).

41.     Wright also testified before the Chairman of the Subcommittee as to his understanding of the Forest Service's regulatory authority and the significance of the <u>Minard Run</u> decision:

> MR. KOSTMAYER: So you do not really have regulatory authority?
>
> MR. WRIGHT: That is correct.
>
> MR. KOSTMAYER: Do you have any regulatory authority, or none at all?
>               *       *       *       *       *
> MR. WRIGHT: I think our authority has to come with the court's decisions that we have received to the Minard Run.  We have now set in place some requirements that the oil and gas operators must meet to satisfy our needs as a surface landowner.

(Plaintiffs' Ex. N, p. 8).

42.     Subsequent to his testimony, Wright submitted to Chairman Kostmayer a letter dated October 4, 1991 from the Office of General Counsel of the U.S. Department of Agriculture wherein the Forest Service reaffirmed its legal conclusion that NEPA did not apply to the exercise of outstanding private oil and gas rights in the ANF.  (Plaintiffs' Ex. N).  That legal opinion concluded as follows:

> Several weeks ago you asked for our legal opinion on the applicability of the National Environmental Policy Act to the exercise of outstanding third party oil and gas rights on National Forest lands in Pennsylvania. Specifically, you asked whether the exercise of such rights constituted a federal action for NEPA purposes. We have reviewed the matter carefully. Based upon the facts presented to us and the formal legal analysis and opinion attached, *we do not find the exercise of such rights on National Forest lands in Pennsylvania to be a federal action for NEPA purposes*. This is so, in part, because Forest Service approval is not a legal condition precedent to the exercise of such rights under

either state law, current federal law or regulation, or Forest Service policy. See for example, FSM 2832. Our Washington office has reviewed the legal opinion and concurs with the substance of its analysis.

In summary, we find that in Pennsylvania, the third party mineral owner, without any express words of grant, is entitled to occupy and use so much of the surface as may be necessary to operate the mineral estate and remove the product. The question of whether the right can be exercised, and the ability to deny that right, is simply not left to the surface owner under Pennsylvania law! A 'reasonable use' standard does govern the exercise of such rights, but it also recognizes the limited role of the surface owner in the process. In other words, if the exercise of such rights extends beyond what is reasonable, as was the situation some years ago in the instance of Minard Run, then your recourse is to move to protect your rights as surface owner, to reach a reasonable accommodation so that each may enjoy their respective rights. See, Pennsylvania Water and Power Co. v. Reigard, 127 Pa. Super. 600, 193 A.311, 313 (1937). *That practice does not elevate your involvement to a federal action for NEPA purposes*.

(Plaintiffs' Ex. G) (emphasis added).

43.     In May, 2007, however, a staff attorney in the Department of Agriculture authored a legal opinion on the subject of "NEPA and Split Estates" which concluded that NEPA applied to the processing of drilling applications in split-estates on federal lands.  (Defendants' Motion to Dismiss, Ex. 4). The legal opinion relies heavily upon two decisions from the Eighth Circuit, Duncan Energy v. U.S. Forest Service, 50 F.3d 584 (8th Cir. 1995) ("Duncan I") and Duncan Energy v. U.S. Forest Service, 109 F.3d 497 (8th Cir. 1997) ("Duncan II"), which will be discussed in greater depth in the Conclusions of Law.

C)     The FSEEE Action and Settlement Agreement

44.     On November 20, 2008, FSEEE and the Sierra Club filed suit against the United States Forest Service seeking declaratory and injunctive relief under the Administrative Procedure Act ("APA") and the National Environmental Policy Act ("NEPA"). See Forest Service Employees for Environmental Ethics v. U.S. Forest Service, 2009 WL 1324154 (W.D. Pa. May 12, 2009) ("FSEEE" or "the FSEEE action").  The plaintiffs alleged that the Forest

16

Service's practice of issuing Notices to Proceed on drilling proposals without first conducting a NEPA analysis was contrary to federal law.

45.     During the pendency of the FSEEE action, the Forest Service ceased processing and issuing NTPs as of January 16, 2009.  (Transcript p. 338, 385; Plaintiffs' Ex. A-6).

46.     Plaintiffs POGAM and AFA filed a motion to intervene in the FSEEE action on December 26, 2008.  The motion was granted on April 7, 2009.  FSEEE, 2009 WL 1324154 at *1.

47.     On April 9, 2009, the non-intervener parties filed a stipulation of dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A) and attached a copy of a settlement agreement which purported to resolve all claims between those parties.   Id.   In the Settlement Agreement, the Forest Service agreed "that it shall undertake appropriate NEPA analysis prior to issuing Notices to Proceed, or any other instrument authorizing access to and surface occupancy of the Forest for oil and gas projects on split estates including both reserved and outstanding mineral interests."  (Plaintiffs' Ex. A-1, p. 2).  The terms of the Settlement Agreement permitted 54 gas and oil projects that were already underway to proceed without further environmental review, but obligated the Forest Service to abstain from issuing any further NTPs without "the use of a categorical exclusion or the preparation of an Environmental Assessment or an Environmental Impact Statement."  (Id).

48.     In a contemporaneous statement explaining the Settlement Agreement to the public released on April 10, 2009 (the "Marten Statement"), the Forest Service confirmed that "[a]ll remaining pending oil and gas proposals, and all future proposals, will be processed after the appropriate level of environmental analysis has been conducted under the NEPA." (Plaintiffs' Ex. A-2).  The Marten Statement further acknowledged "the impact this will have on families and businesses, especially at a time when our nation is facing such a difficult economic downturn" and observed:

> There is no easy explanation of why this is occurring.  The honest answer from us is that we must follow our oath as public servants to uphold the laws, regulations, and policies that define our responsibilities as federal land managers.  Following these

principles can result in us having to make decisions that may impact the people we work, live, interact, and care for. *For some, this impact may be short-term and for others it may be a life time. For us, it will undoubtedly last a life time to see and remember the consequences of these decisions.* We will do everything in our power, with every ounce of energy we have, to work with you through these times and alleviate the consequences as quickly as possible.

Id. (emphasis supplied).

49.   The Marten Statement further provided that the Forest Service intended to move forward on the Settlement Agreement by "initiating a forest-wide site specific environmental analysis for proposals that were not included in the settlement and any other proposals for activity anticipated between now and 2013." (Id.)  In a June 22, 2009 Federal Register statement, the Forest Service confirmed that it intended to comply with the Settlement Agreement by conducting a forest-wide EIS.  74 Fed. Reg. at 29,463 (June 22, 2009).

50.   Neither the Settlement Agreement nor the Marten Statement confirming its adoption were preceded by any opportunity for public notice and comment.  (Transcript p. 370).

51.   The initial forest-wide EIS, which the Forest Service refers to as a "Transition EIS" ("TEIS"), is composed of two distinct phases of inquiry.  (Transcript pp. 326, 331).  The first addresses site-specific analysis for approximately 2,400 wells that have already been submitted and proposed to the Forest Service.  (Transcript p. 326).  The second involves an attempt on the part of the Forest Service to anticipate where future drilling operations in the ANF might be proposed so that site-specific analysis can be conducted in an anticipatory fashion. (Transcript pp. 326, 329, 331).

52.   Fredley concluded, based upon his lengthy experience with the Forest Service, that a "reasonable expectation" for the completion of a forest-wide EIS in the ANF would be "multiple years." (Transcript p. 284).  He relied in part for his estimate on similarly scaled EIS's conducted in other National Forests "from the Lewis & Clark, to the Beaverhead National Forest, down through the Bridger-Teton National Forest, the Carson National

Forest in New Mexico, all the way to the Los Padres National Forest in California," each of which took multiple years.  (Transcript p. 284).

53. During Fredley's testimony, he referenced a 2008 research study which analyzed 2,000 federal EISs conducted by the Forest Service, Federal Highway Administration, and U.S. Corps of Army Engineers over an 8-year time period.  The study concluded that the average time frame to complete an EIS was approximately 3.4 years.  (Transcript p. 285; Fredley Decl. ¶ 12).  A recent search of the Forest Service's NEPA data base conducted by Fredley revealed that the five previous mineral related EISs completed as of 2007 by the Forest Service averaged 5.25 years to complete.  (Transcript pp. 285-86).

54. Once the TEIS is completed and any appeal process has been exhausted, drilling will not be able to resume immediately because the Forest Service will still have to perform additional duties such as "further field verification," marking timber for sale, negotiating a contract for sale of the timber, etc.  (Transcript p. 416-17).

55. District Ranger Anthony Scardina ("Scardina") is the contact person for the federal government relative to the implementation of the TEIS.  (Transcript p. 514; June 22, 2009 Federal Register Notice of Intent to Initiate EIS Process).  He is also the "interdisciplinary team leader" for Forest Service personnel during the TEIS.  (Transcript p. 446).

56. At a public meeting concerning the TEIS held in the summer of 2009, Scardina stated that it was "almost unheard of" to perform a forest-wide EIS "in a year's time," and he confirmed that assessment during his testimony at the hearing.  (Transcript p. 476-77; Plaintiffs' Ex. S-68).  Scardina testified that even an EA takes an average of 8 to 10 months to complete.  (Transcript pp. 510-11, 520; Plaintiffs' Ex. S-72).

57. Marten testified that the TEIS would be completed by mid-April, 2010, and would be finalized by July, 2010, following the completion of any appeals.  I find, however, that the credible evidence does not support Marten's estimate as to the time frame for the completion of the TEIS.

19

58.     Even after completion of the TEIS, any future drilling proposals not included within its scope may potentially require, in Marten's view,  a full EIS if deemed necessary by the Forest Service.  (Transcript p. 367, 427-31).

59.     The Forest Service concedes that state property law is not preempted by the new regulatory scheme and acknowledges that it may not unreasonably interfere with a private mineral owner's right to access his minerals.  (Hearing, July 29, 2009, p. 23; Transcript p. 342). At the hearing, the Court explored with Marten the Forest Service's position as to the meaning of "unreasonable interference":

The Court:     At some point could an unreasonable delay in processing and completing an EIS study represent the type of interference with mineral and oil and gas rights that the Forest Service wants to avoid?

Marten:     In my opinion, no.

          *     *     *     *     *     *     *     *

The Court:     Is it the position of the Forest Service that mineral and oil and gas rights are not unreasonably interfered with regardless of the length of an EIS, as long as the EIS was validly and lawfully requested in the first place?

Marten:     Yes.  In my opinion, from the standpoint – I guess I will clarify what I mean by that.  I am not saying that with the anticipation that the Transition EIS would take years to complete.  It would be an expedited time frame.  So the delay would be minimal, and we'd be looking at the very narrow decision space and analyzing just the potential litigation measures to minimize impacts to the surface resources, which would narrow down the time frame.  So I'm not sure if that helps, but that's – my starting point is not anticipating years' delay.

The Court:     I understand that.  But worst case scenarios, and I'm not suggesting it will or won't happen in this case, I have no fixed opinion on it at all, but there's been anecdotal testimony about other EISs that took three, four, five, six years, and I understand you don't anticipate that.  But is it your position that if you found yourself, for reasons you don't even anticipate right now, in the unhappy position

20

|  | of being three years down the road without being completed – this is just a hypothetical – |
|---|---|
| Marten: | Okay. |
| The Court: | – that that type of delay in this case with these drillers would not represent an unreasonable interference with their property rights; is that your position? |
| Marten: | That would be my position, because I'm fulfilling my obligations. |

(Transcript p. 434-35).

60.   I find, for the reasons which will be discussed more fully below, that Marten's position is legally unsupportable.

61.   Scardina acknowledged that, as of the date of the hearing, the 1986 Forest Plan remained in effect as the operative plan for the ANF relative to private oil and gas interests. (Transcript p. 484-85).

62.   Scardina testified that the Forest Service's election to proceed with a forest-wide EIS was based upon its desire to acquire a holistic, comprehensive view of the impact of gas and oil drilling within the ANF. (Transcript p. 444). He further indicated that the goal of the TEIS was to enable the Forest Service to better manage the ANF as a whole and mitigate environmental damage that might result from viewing individual drilling proposals too narrowly.   (Transcript p. 446).

63.   The Forest Service relies, in part, on a recent increase in the number of drilling applications processed annually for its decision to proceed with a forest-wide EIS. (Transcript p. 320; Marten Decl. ¶4). From 1986 to 2005, the Forest Service approved an average of 225 new wells per year. (Marten Decl, Ex. 2). From 2005 to 2008, the Forest Serviced approved an annual average of 931 new wells. (Marten Decl. ¶4).

64.   However, the testimony reveals that drilling activity in the ANF is somewhat cyclic in nature. From1980 to 1983, the Forest Service averaged approximately 560 new wells annually. (Marten Declaration, Ex. 2). The number of total existing active wells operating

in the ANF decreased from approximately 10,000 in 1986 to approximately 8,000 at the end of 2005. (Transcript pp. 493-95; 1986 ANF Forest Plan, FEIS, p. 3-4; U.S. Forest Service, July 2009 ANF Draft SEIS, Plaintiffs' Ex. S-46, App.C,  p. 13).  Consequently, it would appear that the total number of active wells in the ANF immediately preceding the drilling ban was not appreciably greater than the number of existing wells in the mid-1980's, when the <u>Minard Run</u> framework for processing Notices to Proceed was utilized.

65.    The Forest Service concedes that from 1981 to the inception of the drilling ban, the cooperative interactive approach of <u>Minard Run</u> adequately protected the environmental interests of the Forest Service as surface owner and that it had no occasion to seek judicial relief to protect the interests of its surface estate.  (Oral Hearing, July 29, 2009, p. 28-29).


**D)    Impact of the Drilling Ban in the ANF**

66.    Michael Hale testified in his capacity as president of Belser Hale, Inc.  (Transcript p. 10). Belser Hale, a POGAM member, is located in Bradford, Pennsylvania.  (Transcript p. 10; Hale Declaration, ¶ 1).  Approximately 97 percent of Belser Hale's business involves oil and gas excavating and construction activities such as site preparation,  pipelines, and road construction.  (Transcript pp. 10-11).  Over the past few years, over 60% of Belser Hale's work has been on the ANF.  (Transcript p. 15).

67.    Over the previous 27 years of the company's existence, Belser Hale experienced increasing revenues and grew to an employment force of 23 full time employees. (Transcript p. 11).

68.    Since April, 2009, Belser Hale has experienced a considerable downturn in revenue and business.  Belser Hale's revenue trend in the first half of 2009 decreased by approximately 47% as compared to the first half of 2008.  (Transcript p. 13).  The workforce has been reduced by 25%, to 17 full time employees, and employees have been asked to pay for a portion of their hospitalization care for the first time.  (Transcript p. 12).   Capital

expenditures for equipment necessary to Belser Hale's livelihood have decreased significantly. (Transcript p. 14).

69      Hale characterized the company as being in a "survival mode" and he attributed the downturn to the drilling ban. (Transcript pp. 12, 15). Although he anticipated that 2009 would be a "banner year," the company is now, in Hale's words, functioning "on a week-to-week basis trying to survive . . .". (Transcript pp. 19-20).

70.     Belser Hale has not experienced any economic downturn with regards to the 40% of the company's business that is based outside of the ANF. (Transcript pp. 21-22).

71.     Rick Ristau testified as the owner and president of POGAM member Ristau Drilling LLC, located in Warren Pennsylvania. (Transcript p. 24). Ristau Drilling has been in operation for eight years. (Transcript p. 24). Approximately 90 to 95% of Ristau Drilling's business is on behalf of the Pennsylvania General Energy company in Warren, PA. Approximately 70-80% of the company's work is in the ANF. (Transcript p. 27).

72.     Throughout the first eight years of its existence, Ristau Drilling's revenue increased progressively each year, and the company increased its workforce from 2 to 9 employees. (Transcript p. 25).

73.     In 2008, Ristau Drilling's gross revenue was approximately three million dollars. Ristau estimated that the company's revenue for 2009 would be reduced by two-thirds. (Transcript pp. 25-26).

74.     As a result of the drilling ban, Ristau Drilling has been forced to lay off 4 employees, decreasing the workforce by approximately 40 percent. (Transcript p. 26). Ristau Drilling's revenues over the last few months of 2009 have been less than its cost to operate. (Transcript p. 26).

75.     Ristau attributed the downturn in his company's economic fortunes to the drilling ban in the ANF. (Transcript p. 28). Ristau further testified that his company would have "plenty of work" if the drilling ban were not in effect. (Transcript p. 31).

76. Ristau has been forced to borrow from his business and personal savings to prevent his company from going under and he projected that his company could not survive if the drilling ban remained in effect into 2010. (Transcript p. 29-30).

77. Stephen Dyne testified in his capacity as owner and operator of Dyne Excavating, LLC, located in Kane, Pennsylvania. (Transcript p. 166). Dyne Excavating has been in business since 1985. (Transcript pp. 167). Dyne Excavating performs approximately 75 percent of its work in the ANF, and approximately 70-75 percent of that business is site development for oil and gas extraction. (Transcript p. 167-68).

78. From 1985 through 2008, Dyne Excavating experienced continuous growth and a steady "pipeline" of oil and drilling projects. (Transcript p. 167). In 2008, Dyne Excavating operated three construction crews, each composed of 2 to 5 employees, on oil and gas projects in the ANF. (Transcript p. 167-68).

79. In 2009, Dyne Excavating's oil and gas related work has "noticeably declined" to the point where the company has cut back to one construction crew on oil and gas projects. (Transcript p. 168). Dyne estimated that his company had "maybe one month" of work left to do and that his business would be significantly impacted if the drilling ban remained in place for another 6 months. (Transcript p. 177).

80. Douglas E. Kuntz, the Chief Executive Officer of the Pennsylvania General Energy Company LLC ("PGE"), testified on behalf of the company based on his 22 years with PGE and his extensive familiarity with oil and gas wells. (Transcript, p. 38). PGE, based in the City of Warren, Pennsylvania, is a member of Plaintiff POGAM with approximately 115 employees.

81. PGE owns approximately 40,000 acres of oil and gas rights in the ANF. (Transcript p. 50). Over the past two decades, approximately 75 percent of PGE's oil and gas wells have been located in the ANF. (Transcript p. 38).

82.     It was Kuntz's experience that, prior to the drilling ban, PGE typically received a NTP from the Forest Service within 45-60 days of submitting a well proposal.  (Transcript p. 47).

83.     In 2009, PGE has submitted 86 well proposals to the Forest Service.  PGE has only been permitted to drill 16 wells that were "grandfathered" under the Settlement Agreement. (Transcript p. 45-46).

84.     PGE submitted specific, non-grandfathered well proposals to the Forest Service on January 30, February 25, March 12, March 30, April 15, May 6, May 8 and August 18, 2009. (Transcript pp.49-53; Plaintiffs' Ex. S-1 through S-11, S-13).   Had those proposals been approved, PGE would have drilled or begun to drill the wells contained in those proposals. (Transcript p. 47).

85.     PGE also submitted an August 17, 2009 proposal for a "Marcellus shale" well.  Marcellus shale formations constitute "one of the hottest oil and gas plates in the continental U.S." and present unique and potentially enormous economic opportunities for drillers. (Transcript pp. 53-54).  PGE possesses the resources to proceed with the Marcellus shale well proposal immediately but has been unable to do so because of the current drilling ban. (Transcript p. 54).

86.     PGE has experienced constant increased oil production over the last 30 years despite "numerous economic upturns and downturns."  (Transcript p. 57, 61).  In 2009, however, PGE's oil production declined by approximately 20 percent as a result of the drilling ban in the ANF.  This has produced a decrease in oil reserves and a corresponding drop in the company's value.   (Transcript pp. 58-59).

87.     Kuntz characterized the effect on PGE as "devastating" if the current ban on drilling in the ANF were to remain in place.  (Transcript p. 59).

88.     Guy Shirey, a petroleum engineer, testified in his capacity as Operations Manager for the East Division of Seneca Resources Corporation, a member of POGAM. (Transcript p. 207).

Seneca Resources owns approximately 187,000 acres of oil and gas property interests in the ANF. (Transcript p. 208).

89.     At the time of the Settlement Agreement, Seneca Resources was prepared to proceed on five well packages consisting of about 35 wells. (Transcript p. 212-13). As a result of the drilling ban, however, it has not been permitted to begin work on any of those wells. (Transcript p. 213).

90.     Shirey estimated that Seneca Resources would incur a combined financial loss of approximately $7.3 million as a consequence of being unable to drill in the ANF in 2009 and 2010. (Transcript p. 217). The company also has been unable to explore development of the valuable Marcellus shale underneath its ANF property holdings. (Transcript p. 218).

91.     Frederick W. Fesenmeyer testified that he is the owner, president, and CEO of Plaintiff Minard Run Oil Company. (Transcript p. 228-29). Minard Run, located in Bradford, Pennsylvania, is the oldest independent oil company in the world, having owned and operated on the same properties for 134 years. (Transcript p. 229). Minard Run owns approximately 5,700 acres in the ANF. (Transcript p. 230).

92.     Over the past 29 years, Minard Run typically received a NTP on a drilling proposal within 60 days of submission. (Transcript p. 232).

93.     Minard Run has already drilled all of the wells that it obtained NTPs for prior to the date of the Settlement Agreement. Minard Run has the capital resources to drill additional wells but has been unable to do so as a result of the drilling ban. (Transcript pp. 234-35).

94.     Fesenmeyer anticipates that it will be necessary to begin laying off employees if the drilling ban extends into 2010. (Transcript p. 235).

95.     William Fustos testified that he is the chief operating officer for East Resources, Inc., a member of POGAM. (Transcript p. 183). East Resources owns approximately 69,000 acres of mineral estate in the ANF and leases mineral rights on approximately 15,000

additional acres.  (Transcript p. 185).  East Resources has approximately 135 full time employees in Pennsylvania.  (Transcript p. 184).

96.  East Resources delivered a 32-well drilling proposal to the Forest Service in February, 2009.  As a result of the drilling ban, the Forest Service has not issued a NTP for that drilling package.  (Transcript p. 189).

97.  Prior to the Settlement Agreement, East Resources typically received a NTP within 60 days of submitting a drilling proposal.  (Transcript p. 186).

98.  East Resources also owns and operates four natural gas processing plants in and around the ANF.  (Transcript p. 191).  These plants use a refrigeration process to extract natural gas liquids such as propane, butane, and natural gasolines from natural gas.  East Resources then sells both the liquids and inserts the remaining natural gas into an interstate pipeline for sale.  (Transcript p. 192).  Each plant is a multi-million dollar facility.

99.  Approximately 80 percent of the natural gas processed in East Resource's processing plants comes from other companies, with the remaining 20 percent belonging to East Resources.  Collectively, the plants process approximately 10 billion cubic feet of gas annually.  (Transcript p. 195).

100.  Following the Settlement Agreement, gas production from East Resources's ANF properties has decreased by approximately 15 percent.  The liquid gas plants have seen a similar reduction in output.  (Transcript p. 196).  Another 10 to 15 percent decrease is anticipated if the drilling ban remains in effect through 2009.  (Transcript p. 197).  Fustos further projected that such a reduction would cause East Resources to shut down "one or more" of its processing plants, impacting both East Resource's own gas processing and that of other producers in the area who utilize East Resources processing plants.  (Transcript p. 197).

101.  Harvey Golubock testified in his capacity as the president and chief operating officer of The American Refining Group and as president of ARG Resources.  (Transcript p. 89).

Located in Bradford, Pennsylvania, the American Refining Group is the "oldest continuously operating refinery processing crude oil in the world." (Transcript p. 89). ARG Resources is an affiliated oil and gas producing company owning approximately 18,000 acres of oil and gas properties in the ANF. (Transcript p. 93). The American Refining Group employs approximately 325 full-time employees, and ARG Resources employs another 46. (Transcript p. 90).

102.   The American Refining Group generates gross revenues of approximately $350-400 million annually. (Transcript p. 90). Approximately 50 percent of the products produced by the refinery are gasoline and fuel oil, with the other half consisting of lubricants, waxes, petroleums and natural solvents. (Transcript p. 91).

103.   Approximately 20 to 25 percent of the crude oil processed in the Bradford refinery originates in the ANF. (Transcript p. 92; Plaintiffs' Ex. C).

104.   In order to operate profitably, it is necessary that the Bradford refinery operate at 85 to 90 percent of its throughput level. (Plaintiffs' Ex. 92). Crude oil deliveries through the late summer of 2009, however, have decreased by approximately 10 percent in comparison with the same time period in 2008. (Transcript pp. 98-99). Golubock characterized as "quite unusual" the drop in oil deliveries during the summertime, which is typically the "high point of the year," and he attributed the "reduction in deliveries" to the "lack of drilling in the [ANF]." (Transcript p. 100).

105.   A continued decrease in oil deliveries over the next six month period would, in Golubock's view, require the refinery to reduce its crude runs to match crude oil receipts and would produce a significant economic impact on the refinery. (Transcript p. 101).

106.   I credit the previously summarized testimony of Hale, Ristau, Dyne, Kuntz, Shirey, Fesenmeyer, Fustos and Golubock as to the manner in which each of their companies have been severely and adversely affected by the drilling ban. I also credit their testimony that

the significant economic impact sustained by their companies is the direct result of the drilling ban in the ANF.

107.   John Bortz testified that he is an elected Commissioner of Warren County, Pennsylvania, serving the second of two four-year terms.  (Transcript p. 109).  Warren County has approximately 42,500 residents.  (Transcript p. 109).  Approximately 26 percent of the real estate located within Warren County is owned by the ANF.  (Transcript p. 109).

108.   Bortz testified that Warren County holds the "Hoffman Trust" to serve the needs of the underprivileged within Warren County.  In addition to a direct financial holding of approximately $700,000, the Hoffman Trust owns the oil and gas rights to over 1,000 acres of land in the ANF.  (Transcript p. 114-15).  He further indicated that several oil and gas companies have expressed interest in obtaining or leasing those mineral rights in recent years.  (Transcript p. 115).  Warren County's oil and gas properties in the ANF are not currently being utilized to produce oil or gas.  While Bortz indicated that the County has a renewed "interest" in utilizing those properties to offset potential cuts in funding, he testified that active negotiations with potential buyers are not taking place at present and that no current offer to buy or lease the property has been solicited.  (Transcript pp. 117, 120).

109   Sandra Chlopecki testified in her capacity as the current president of the Allegheny Forest Alliance and as Superintendent of Kane Area School District, located in McKean and Elk Counties in Pennsylvania.  (Transcript pp. 134-35).  The AFA is an organization comprised of seven school districts, 33 municipalities, and various business entities and recreational groups.  (Transcript pp. 136-37).

110.   Kane School District receives approximately $500,000 of its annual budget from receipts from sales of timber cut in the ANF.  (Transcript pp. 135-36).  Kane School District also utilizes wood chips from timber to provide heat for the schools in the district.  (Transcript pp. 144-46).  Portions of the timber harvesting activities that provide these benefits to the

Kane School District occur in connection with oil and gas site preparation activities in the ANF.  (Transcript p. 139).

111.    To date, the Kane School District's budget has not been "directly affected" by the current ban on drilling in the ANF.  (Transcript p. 164).  The Kane School District is currently receiving sufficient wood chips from other sources.  (Transcript p. 162).


## CONCLUSIONS OF LAW

### A) Defendants' Jurisdictional Challenge

Defendants contend that Plaintiffs' claims fail for lack of subject matter jurisdiction. Specifically, they assert that none of the Plaintiffs have established the requisite standing required under Article III of the Constitution.  In addition, the Forest Service argues that its actions taken pursuant to the Settlement Agreement do not represent "final agency action" and are, therefore, not subject to judicial review under the APA.

#### 1.    Standing

Whether a party has standing under Article III of the Constitution is a "threshold jurisdictional question" that a court must decide prior to considering the merits of the action.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102.  The Supreme Court has held that the "irreducible constitutional minimum of standing" contains the following three elements:

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  The burden is on the party seeking federal jurisdiction to establish these elements of standing.  Id. at 561.

30

When a suit challenges the legality of government action or inaction, the proof required to establish standing "depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." Id. at 561-62. "If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." Id. In contrast, where "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else," a stronger showing of standing is required. Id.

In Lujan, several environmental groups challenged a regulation promulgated by the Secretaries of Commerce and the Interior that excluded actions taken in foreign nations from the scope of a particular section of the Endangered Species Act. The Court acknowledged that the environmental groups were undoubtedly "interested" in the protection of endangered species abroad, but concluded that none of the individual members of those groups were actually "injured" by the regulation. Rather, because the asserted injury "ar[ose] from the government's allegedly unlawful regulation . . . of *someone else*," rather than from a regulation directed at the environmental groups themselves, the parties' generalized contention that they hoped to someday travel abroad and observe endangered animals was insufficient to demonstrate standing. Id. at 562-64.

In Summers v. Earth Island Inst., 129 S.Ct. 1142 (2009), environmental groups challenged a Forest Service regulation that exempted proposed salvage sales of fire-damaged timber from public notice and comment. The Supreme Court noted that the regulations cited by the environmental groups "neither require nor forbid any action on the part of" the environmental groups. Id. at 1149. The only injury asserted by the environmental groups was the general recreational interests of their members. Since none of those members had submitted any evidence specifically indicating that he or she intended to visit an area of a particular National Forest that had been affected by the allegedly unlawful timber sale, the Court found that the plaintiffs lacked standing. Id.

Relying in part on Summers and Lujan, Defendants contend that Plaintiffs have failed to demonstrate that they have suffered actual, concrete, particularized "injury in fact." With regard to

31

Plaintiffs Minard Run and POGAM, I disagree.  Credible evidence, as discussed more fully in the Findings of Fact, supports the conclusion that Minard Run and POGAM members Belser Hale, Ristau Drilling, Dyne Excavating, PGE, Seneca Resources, East Resources, and The American Refining Group have experienced significant adverse economic impacts directly attributable to the drilling ban in the ANF.  Unlike the general, hypothetical allegations of injury offered in <u>Lujan</u> and <u>Summers</u>, I find that the Plaintiffs' injuries are concrete, ascertainable, identified and particularized.

I also find that the injuries are not only "fairly traceable" but, in fact, clearly and directly attributable to the drilling ban occasioned by the Forest Service's commitment in the Settlement Agreement to require NEPA analysis prior to issuing NTPs on drilling proposals in the ANF. Minard Run and POGAM's members are plainly the objects of that decision.  As previously noted, where the parties challenging an action are the objects of that action, "there is ordinarily little question that the action or inaction has caused [the] injury, and that a judgment preventing or requiring the action will redress it."  <u>Id</u>.  As such, Plaintiffs POGAM and Minard Run have satisfied the "irreducible constitutional minimum" necessary for standing.  <u>Lujan</u>, 504 U.S. at 560-61.

I reach a different conclusion, however, with respect to Plaintiffs Warren County and the AFA.  Unlike the oil and gas industry plaintiffs, Warren County and the AFA are not the "objects" of the Settlement Agreement.  Rather, like the environmental group plaintiffs in <u>Lujan</u> and <u>Summers</u>, their asserted injuries "arise[] from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*."  <u>Lujan</u>, 505 U.S. at 562-64 (emphasis in original).  The evidence fails to establish that the AFA has suffered a concrete and particularized injury as a result of the drilling ban.  In fact, Chlopecki testified that revenues from timber harvesting have not diminished and that sufficient wood chips are currently being provided not withstanding the drilling ban.  With respect to Bortz's testimony on behalf of Warren County, I find that his broad and non-specific claims of damage to Warren County in general are not sufficiently particularized or concrete.  I further find that the claim of damage to the Hoffman Trust as a result of Warren County's alleged inability to market and sell its oil and gas holdings in the ANF is unduly speculative.

## 2.      Final Agency Action

Pursuant to the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  The APA further provides that a court shall:

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be –
>
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>
>> (B) contrary to constitutional right, power, privilege, or immunity;
>>
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>>
>> (D) without observance of procedure required by law;
>>
>> (E) unsupported by substantial evidence . . .; or
>>
>> (F) unwarranted by the facts . . ..

5 U.S.C. § 706(2).  Thus, a threshold requirement for judicial review under the APA is "some 'agency action' that affects" the party seeking review.  Lujan v. National Wildlife Fed'n., 497 U.S. 871, 882 (1990).  Where review is sought pursuant to the general review provisions of the APA, rather than to specific authorization in the substantive statute at issue, the "agency action" in question must be "final agency action."  Id. (quoting 5 U.S.C. § 704) ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.").

An agency action is "final" if it marks "the 'consummation' of the agency's decisionmaking process" and is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  Bennett v. Spear, 520 U.S. 154, 178 (1997) (internal citations omitted).  Legal consequences flow from an agency action that "alter[s] the legal regime to which the action agency is subject."  Id.  A settlement agreement can constitute a judicially reviewable final agency

33

action where it is alleged that the agency "exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations" in agreeing to the settlement. U.S. v. Carpenter, 526 F.3d 1237, 1241-42 (9th Cir. 2008) (citing Guadamuz v. Bowen, 859 F.2d 762, 767 (9th Cir. 1988); Executive Business Media, Inc. v. U.S. Dept. of Defense, 3 F.3d 759, 761 (4th Cir. 1993)).

       Here, the Settlement Agreement and contemporaneous Marten Statement implementing its terms represent, in my view, a fundamental "sea change" in the manner in which the Forest Service had previously interacted with oil and gas drillers in the ANF for almost 30 years by requiring it to engage in a lengthy NEPA review process that had not previously been applied.  Moreover, as discussed more fully below, the Plaintiffs contend that the actions of the Forest Service in this case exceed its authority and are contrary to law.  See Carpenter, 526 F.3d at 1242 (concluding that a discretionary decision by the Attorney General to enter into a settlement agreement was subject to review where it was alleged to exceed the agency's legal authority).     Consequently, I conclude that the APA's finality requirement is satisfied.

### B.  Merits of the Motion for Preliminary Injunction

       "An injunction is an 'extraordinary remedy' that is never awarded as of right." Winter v. NRDC, – U.S. – , 129 S.Ct. 365, 375 (2008).  Under the Third Circuit's "traditional" criteria, a plaintiff must demonstrate "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief. " Kos Pharm. v. Andrx Corp., 369 F.3d 700, 708 (3rd Cir. 2004).  Additionally, "[t]he injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." Merchant & Evans v. Roosevelt Bldg. Products Co., 963 F.2d 628, 632-33 (3rd Cir. 1992) (emphasis added).  Plaintiff bears the burden of establishing these elements, see Adams v. Freedom Forge Corp., 204 F.3d 475, 486 (3rd Cir. 2000), and the failure to establish any element

in its favor renders a preliminary injunction inappropriate. <u>Nutrasweet Co. v. Vit-Mar Enters. Inc.</u>, 176 F.3d 151, 153 (3rd Cir. 1999).

The above-cited factors "structure the inquiry," and the court's task is to balance those four elements. <u>Construction Ass'n. of Western Pennsylvania v. Kreps</u>, 573 F.2d 811, 813 (3rd Cir. 1978). "All of these factors often are weighed together in the final decision and the strength of the plaintiff's showing with respect to one may affect what will suffice with respect to another." <u>Marxe v. Jackson</u>, 833 F.2d 1121, 1128 (3rd Cir. 1987) (citing <u>Kreps</u>, 573 F.2d at 815). Thus, for example, "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." <u>Serono Laboratories, Inc. v. Shalala</u>, 158 F.3d 1313, 1318 (D.C. Cir. 1998); <u>see</u> <u>also</u> <u>Neo Gen Screening, Inc. v. TeleChem Intern., Inc.</u>, 69 Fed.Appx. 550, 554 (3rd Cir.2003); <u>CityFed Fin. Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738, 747 (D.C. Cir.1995) ("An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury.").

### 1.    Likelihood of Success on the Merits
#### a) Substantive challenge

I begin with an analysis of the Plaintiffs' substantive contention that the Settlement Agreement and its subsequent implementation is contrary to law. Because, as previously discussed, the <u>Minard Run</u> decision figured predominantly in the manner in which the Forest Service and the drillers had cooperatively interacted prior to the implementation of the Settlement Agreement, a more in depth review of <u>Minard Run</u> is appropriate.

In <u>Minard Run</u>, the United States, as surface owner of the ANF, brought an action alleging that Minard Run Oil Company's failure to provide advance notice of drilling activities in the ANF was causing undue damage to the surface estate and depriving the United States of the ability to find a purchaser for timber cleared as a result of drilling construction. 1980 U.S. Dist. Lexis 9570, *4-6. The <u>Minard Run</u> court began its analysis with a review of Pennsylvania law relative to the

obligations of dominant and servient estate holders in a split-estate context.  The court noted that the mineral estate is the "dominant" estate and the owner thereof has an absolute right to occupy as much of the surface to access and extract his minerals as necessary without the necessity of obtaining consent, except as set forth in deed.  Id. (citing Chartiers Block Coal Co. v. Mellon, 25 A. 597, 598 (Pa. S. Ct. 1893); Clearfield Bank & Trust Co. v. Shaffer, 553 A.2d 455, 457-58 (Pa. Super. 1989)). The court further observed, however, that the mineral estate owner must exercise his right of occupancy with due regard for the surface owner and, as such, may only occupy so much of the surface estate as reasonably necessary to remove his minerals and must take steps to mitigate and minimize damage to the surface estate.  Id. (citing Babcock Lumber Co. v. Faust, 39 A.2d 298, 303-04 (1944)).  Thus, the court concluded that the right of absolute access is constrained only by the obligation to exercise "due regard" for the surface owner, an obligation the surface owner may enforce by seeking judicial review.  Id. (citing Chartiers, 25 A. at 598).[3]

As a factual matter, the court found that the company's failure to provide notice of drilling activities "ha[d] been both unnecessary to defendant's mineral operations and detrimental to plaintiff's use of its own estate."  In order to balance the competing interests of the company's right to "reasonable use" of the surface as necessary to remove its minerals with its corresponding obligation to exercise due regard for the surface owner's rights, the court prescribed what it characterized as several "minor restrictions" upon the oil company.  These restrictions, tailored so

---

[3]    The Pennsylvania Supreme Court recently affirmed that a mineral estate owner has an absolute right to access and extract their minerals without consent of the surface estate owner and that the surface owner "cannot unilaterally impose extra conditions on the subsurface owner."  Belden & Blake Corp. v. Pennsylvania, 969 A.2d 528, 532-33 (Pa. 2009).  In Belden, the plaintiff, owner of oil and gas rights in a state park, sought to develop gas wells on several parcels of land.  The Pennsylvania Department of Conservation and Natural Resources (DCNR) attempted to impose a "coordination agreement" on plaintiff prior to allowing drilling preparation to proceed.  The Court ruled for the mineral owner, holding that "a property owner's interests and rights cannot be lessened, nor their reasonable exercise impaired without just compensation, simply because a government agency with a statutory mandate comes to own the surface."  Id. at 533.

as not to "seriously hamper the extraction of oil and gas," included the requirement that an oil driller provide 60 days advance notice to the Forest Service of proposed drilling activities.  Id.

From 1981 through the inception of the drilling ban, the Forest Service followed the directives set forth in Minard Run relative to its interaction with owners of private mineral estates in the ANF.  As reflected in the Findings of Fact and consistent with Minard Run, the Forest Service's interaction was based upon the principle that the mineral estates were dominant and that its ability to interfere with the exercise of those mineral rights was significantly circumscribed. Consistent with this understanding, the Forest Service and the mineral estate owners interacted in a cooperative effort to address and resolve any concerns relative to drilling proposals.  In the overwhelming majority of cases, the process was completed at or near the 60 day time period referenced in Minard Run.

In contrast to the long-standing practice of cooperative interaction described above, the Settlement Agreement obligates the Forest Service to apply NEPA to all future oil and gas proposals in the ANF.  NEPA is an information gathering statute which requires all agencies of the federal government to "prepare a detailed environmental analysis for major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).  NEPA is procedural in nature and, therefore, "does not impose substantive duties mandating particular results, but simply prescribes the necessary process for preventing uninformed - rather than unwise - agency action." Robertson v. Methow Valley Citizens Council, 490 U.S. 360, 371 (1989).

NEPA is triggered only by a proposal for *major* federal action. Sierra Club v. Penfold, 857 F.2d 1307, 1312 (9th Cir. 1988).  Thus, in determining whether NEPA applies to an action, the court must "make the 'threshold determination' whether there is a major federal action."  Mineral Policy Center v. Norton, 292 F.Supp.2d 30, 53 n. 27 (D.D.C. 2003) (quoting Save Courthouse Comm. v. Lynn, 408 F.Supp. 1323, 1341 (S.D.N.Y. 1975)); see also Save Barton Creek Ass'n v. Fed. Highway Admin., 950 F.2d 1129, 1133 (5th Cir. 1992) ("The requirements of NEPA, which include, among

other things, the submission of an EIS, apply only when the federal government's involvement in a project is sufficient to constitute 'major federal action.'").

A project conducted by non-federal actors, such as oil and gas drilling by private parties, will only trigger NEPA if it requires a federal agency to undertake "affirmative conduct" before the non-federal actor may act.  Mineral Policy Center, 292 F.Supp.2d at 54-55, n. 31 (citing State of Alaska v. Andrus, 429 F.Supp. 958, 962-63 (D. Alaska 1977)).  As set forth in the NEPA implementing regulations, an activity must be "potentially subject to Federal control and responsibility" in order to constitute major federal action.  40 C.F.R. § 1508.18.  "If . . . the agency does not have sufficient discretion to affect the outcome of [an] action, and its role is merely ministerial, the information that NEPA provides can have no affect on the agency's actions, and therefore NEPA is inapplicable."  Citizens Against Rails-to-Trails v. Surface Transp. Bd., 267 F.3d 1144, 1151 (D.C. Cir. 2001).

Once a proposal is determined to constitute a "major federal action," agencies are required to take a "hard look" at the environmental consequences of a proposed action where the action could have a significant effect on the environment.  Utahns for Better Transportation v. United States Dep't of Transportation, 305 F.3d 1152, 1162 (10th Cir. 2002). If the proposal is likely to have a significant impact on the environment, the agency must prepare Environmental Impact Statement ("EIS") addressing such considerations as "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action."  42 U.S.C. § 4332(c).  Where the action is not likely to have a significant impact on the environment, the agency must prepare an "environmental assessment" ("EA"), a "concise public document" containing "sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact."  40 C.F.R. § 1508.9(a).  If the EA confirms that the action will not significantly affect the environment, an EIS is not required and the agency may issue a "Finding of No Significant Impact" ("FONSI").  40 C.F.R. § 1508.13.

Central to the Forest Service's position that its regulatory authority concerning the processing of drilling requests is such that it constitutes a major federal action, triggering the requirements of NEPA, are the Eighth Circuit decisions in <u>Duncan Energy v. U.S. Forest Service</u>, 50 F.3d 584 (8th Cir. 1995) ("<u>Duncan I</u>") and <u>Duncan Energy v. U.S. Forest Service</u>, 109 F.3d 497 (8th Cir. 1997) ("<u>Duncan II</u>").  Indeed, counsel for the Forest Service confirmed the significance of the <u>Duncan Energy</u> decisions to the Forest Service's legal position:

> The Court:    [W]ould it be too strong of a statement for me to make that when it comes to the case law, you put most of your opposition eggs in the Duncan basket?
>
> Counsel:    We do, because we believe Duncan is right on point and very persuasive.

(Oral Hearing, July 29, 2009, pp. 41-42; Transcript p. 610).

In <u>Duncan I</u>, a dispute arose between the Forest Service and two companies that owned mineral rights in the Custer National Forest in North Dakota.  The surface estate of the National Forest had been acquired by the United States in 1937 pursuant to the Bankhead-Jones Farm Tenant Act, subject to the pre-existing mineral reservation (conveyed by deed in 1916).  From 1984 until 1992, mineral drilling took place through a cooperative procedure, memorialized in a Memorandum of Understanding, whereby the drillers would provide advanced notice of proposed drill sites and thereafter interact with the Forest Service in a cooperative effort to protect the interests of the surface estate. Beginning in 1992 and 1993, however, the Forest Service concluded that the Memorandum of Understanding no longer applied and that the more extensive procedures of NEPA were appropriate.  As a result, the Forest Service ordered plaintiffs to cease drilling until an area-wide environmental analysis could be conducted.

Plaintiffs filed suit in federal court seeking a declaratory judgment that the Forest Service could not lawfully "prohibit access to or regulate the exploration and development of the privately owned oil and gas estate."  <u>Id</u>. at 587.  The Forest Service countered by seeking a preliminary

injunction barring plaintiffs from conducting drilling activities in the National Forest without the

Forest Service's express written authorization.

The <u>Duncan I</u> Court framed the debate by noting that "[t]he only issue before us is the

Forest Service's ability to regulate surface access to outstanding mineral rights." <u>Id</u>. at 589.  After

determining that North Dakota state law provided no regulatory authority for the Forest Service, the

Court next considered whether federal law - specifically, the National Park Service Organic Act[4] and

the Bankhead-Jones Act - provided that authority:

> Congress has the power under the property clause to regulate
> federal land.  U.S. Const. art. IV, § 3, cl. 2; <u>California Coastal
> Comm'n v. Granite Rock Co.</u>, 480 U.S. 572, 580, 107 S.Ct. 1419,
> 1424-25, 94 L.Ed.2d 577 (1987). Indeed, Congress may regulate
> conduct occurring on or off federal land which affects federal land.
> <u>See</u>, <u>e.g.</u>, <u>Kleppe v. New Mexico</u>, 426 U.S. 529, 539, 96 S.Ct.
> 2285, 2291-92, 49 L.Ed.2d 34 (1976); <u>Minnesota v. Block</u>, 660
> F.2d 1240, 1249 (8th Cir.1981), <i>cert. denied</i>, 455 U.S. 1007, 102
> S.Ct. 1645, 71 L.Ed.2d 876 (1982).
>
> Under the Bankhead-Jones Farm Tenant Act, Congress directed
> the Secretary of Agriculture "to develop a program of land
> conservation and land utilization." 7 U.S.C. § 1010 (1988). The
> Act directs the Secretary to make rules as necessary to "regulate
> the use and occupancy" of acquired lands and "to conserve and
> utilize" such lands. 7 U.S.C. § 1011(f) (Supp.V.1993). The Forest
> Service, acting under the Secretary's direction, manages the
> surface lands here as part of the National Grasslands, which are
> part of the National Forest System. <u>See</u> 16 U.S.C. § 1609(a)
> (1988). Congress has given the Forest Service broad power to
> regulate Forest System land. <u>See</u>, <u>e.g.</u>, 7 U.S.C. § 1011 (1988 &
> Supp.V.1993); 16 U.S.C. § 551 (Supp.V.1993).
>
> The Forest Service finds its authority to regulate surface access to
> outstanding mineral rights in the "special use" regulations. The
> special use regulations provide that "[a]ll uses of National Forest
> System land ... are designated 'special uses' and must be approved
> by an authorized officer." 36 C.F.R. § 251.50(a).

<u>Id</u>. at 588-89.  The Court concluded that "the Forest Service has the limited authority it seeks here;

that is, the authority to determine the reasonable use of the surface."  <u>Id</u>. at 591.

---

[4]      Congress enacted the Organic Act in 1897 in order to "give[] the Forest Service
broad power to regulate Forest System land."  <u>See</u> <u>Duncan I</u>, 50 F.3d at 589; 16
U.S.C. § 551.

Significantly, however, the Court emphasized that the mineral developers had an absolute right to mineral development and that the Forest Service's "limited authority" to regulate drilling did not extend to "veto authority." Id. at 591 n. 8. Thus, the Court cautioned that "[i]mplicit in our conclusion that the Forest Service is authorized to determine the reasonable use of the federal surface is our assumption that the Forest Service's inquiry must be reasonable, and thus, expeditious." Id. The Court opined that a timeframe of "about two months" was both "consistent with the Forest Service's authority" and "not violat[ive of] the mineral holder's dominant right to access and develop its mineral estate." Id. The Duncan I Court remanded with instructions for the district court to enter an order "declaring that [plaintiffs] violated Forest Service regulations by proceeding with mineral development absent Forest Service authorization of the surface use plan." Id. at 591-92.

On remand, the district court entered a permanent injunction which required, *inter alia*, that the processing of surface use plans be completed "within two months." Duncan II, 109 F.3d at 499. Following a second appeal by the Forest Service, the Eighth Circuit rejected the district court's imposition of an inflexible sixty-day deadline. Duncan II, 109 F.3d at 500. Rather, the Court concluded that:

> Reasonableness of processing time must be determined on the basis of the totality of circumstances related to each surface use plan and the obligations of the Forest Service. The prior course of conduct between the parties is one factor to consider, but it is not the controlling factor. The Forest Service has only limited authority to regulate use of the subservient surface estate by the dominant mineral estate, and its processing time must be reasonable, expeditious, and as brief as possible. Should future developments reveal a pattern of unwarranted delay by the Forest Service in processing proposed surface use plans, it may be necessary to revisit our determination that the imposition of a sixty-day limitation is too rigid a schedule for the Forest Service to meet.

Id.

For the reasons that follow, I find that the Duncan Energy decisions do not support the Forest Service's expansive claim of regulatory authority in this case.

41

I first note, and the Forest Service concedes, that the applicability of NEPA to drilling requests on federal land was not at issue in either of the two <u>Duncan Energy</u> decisions.  (Transcript pp. 611-12).  Consequently, the <u>Duncan Energy</u> decisions did not address the issue as to whether the approval of drilling requests constituted a major federal action in the context of NEPA.  Further, given <u>Duncan II</u>'s directive that the processing of drilling proposals "must be reasonable, expeditious, and as brief as possible,"  <u>Duncan II</u>, 109 F.3d at 500, the lengthy delay occasioned by the drilling ban here would likely not pass muster as "reasonable" under the <u>Duncan</u> decisions.

I also observe that a federal agency's authority to regulate in a split-estate context is properly determined by the terms of the specific statute pursuant to which the federal estate was acquired.  In <u>Burlison v. United States</u>, for example, the Sixth Circuit was asked to determine whether the National Wildlife Refuge System Administration Act of 1966, 16 U.S.C. § 688dd, invested the United States Fish and Wildlife Service with authority to regulate a private easement over federal land.  <u>Burlison</u>, 533 F.3d 419 (6th Cir. 2008).  The Court restricted its inquiry to the provisions of the Wildlife Refuge Act to determine the extent of the Wildlife Service's regulatory authority, rejecting guidance from cases (including <u>Duncan I</u>) that involved distinct pieces of legislation:

> The government cites cases in which our sister circuits determined that the federal government has authority to regulate easements and other rights-of-way under the Park Service Organic Act, 16 U.S.C. § 1; the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1784; and the Alaska National Interest Lands Conservation Act of 1980 ("ANILCA"), 16 U.S.C. §§ 3103-3233. . . . . In <u>Duncan</u>, the Eighth Circuit stated that "Congress has given the Forest Service broad power to regulate Forest System land." 50 F.3d at 589 (citing 7 U.S.C. § 1101; 16 U.S.C. § 551). The Eighth Circuit held that the "'special use' regulations" providing that "[b]efore conducting a special use, individuals or entities must submit a proposal to the authorized officer and must obtain a special use authorization," 36 C.F.R. § 251.50(a), give the Forest Service authority "to regulate surface access to outstanding mineral rights." <u>Duncan</u>, 50 F.3d at 589. . .
>
> \*       \*       \*       \*       \*       \*       \*
>
> None of these cases cited by the government are determinative because they all involve statutes that differ in significant respects from the Refuge Act. The Refuge Act does not contain a provision granting broad regulatory authority akin to the sweeping authority

> granted in 16 U.S.C. § 1. Nor do the federal regulations pertaining
> to the Refuge Act contain "special use" regulations as broad as
> those in 36 C.F.R. § 251.50(a).

Id. at 435.  Here, the instant action similarly involves a statute that "differ[s] in significant respects" from that at issue in Duncan I.  In contrast to the Bankhead-Jones Act, which broadly grants the Secretary of Agriculture the ability to create rules as necessary to "regulate the use and occupancy" of lands acquired pursuant to that statute, the Weeks Act, by its terms, *restricts* the Secretary's ability to burden the dominant estate to those rules and regulations that are contained in the instrument of conveyance:

> Such rights of way, easements, and reservations retained by the
> owner from whom the United States receives title, shall be subject
> to the rules and regulations prescribed by the Secretary of
> Agriculture for their occupation, use, operation, protection, and
> administration, *and such rules and regulations shall be expressed
> in and made part of the written instrument conveying title to the
> lands to the United States*; and the use, occupation, and operation
> of such rights of way, easements, and reservations shall be under,
> subject to, and in obedience with the rules and regulations so
> expressed.

16 U.S.C. § 518 (emphasis added); see also United States v. Srnsky, 271 F.3d 595, 601-02 (4th Cir. 2001).  In other words, "with unmistakable clarity, [the Weeks Act] *does* require that any rules or regulations that the Secretary wishes to apply . . . must be 'expressed in and made part of' the instrument of conveyance." Id. (emphasis in original).  For the vast majority of ANF properties acquired by the federal government prior to 1937, the deeds do not provide the Forest Service with the regulatory authority that it contends it possesses here.

In addition, although Duncan I determined that access to private mineral rights was a "special use" of National Forest land and, therefore, subject to approval by a Forest Service officer, Duncan I, 50 F.3d at 589, the Organic Act's special use regulations are inapplicable to land acquired pursuant to the 1911 Weeks Act.  See Srnsky, 271 F.3d at 602.  In Srnsky, the Forest Service sought to compel a private landowner to apply for a special use permit in order to utilize an implied easement over a National Forest road that provided the sole access to their home.  Id.  The National Forest land had been acquired by the federal government directly from the Srnsky's predecessor in

43

interest, a private party, pursuant to the Weeks Act.  The government argued that, notwithstanding the validity of the easement under state law, "the neighboring land in this case is a National Forest and access across that land is regulated as a matter of federal law by Congress pursuant to its authority under the Property Clause."  Id.  The landowners countered that none of the statutes cited by the Forest Service, including the Organic Act, provided the regulatory authority that the Forest Service sought.

The Court held that, "with the possible exception of section 551," "the Organic Act applies only to forests *reserved from public land*," as opposed to land "purchased . . . directly from a private party."  Id. at 600 (emphasis in original).  While the Court acknowledged that section 551 could arguably apply to federal land obtained from private parties,[5] it held that its application was precluded in those circumstances where the land at issue was acquired pursuant to the Weeks Act:

> [E]ven if we assume that section 551 applies to land acquired under the Weeks Act and that the general language of section 551 could be read to allow the Secretary to regulate state common law easements, we conclude that . . . the Weeks Act, 16 U.S.C. § 518, precludes regulation of such easements under section 551.
>
>     \*    \*    \*    \*    \*    \*    \*
>
> To the extent, if any, that section 551 , enacted in 1897, could be read to allow regulation of such easements, the more recent and specific statute, section 518 [the Weeks Act], enacted in 1911 and amended in 1913, must prevail.  Because no such regulations appear in the deed by which the United States took title, J.A. 48-51, section 551 does not apply to this case.

---

[5]    Section 551 of the Organic Act provides:

The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests which may have been set aside or which may be hereafter set aside under the provisions of section 471 of this title, and which may be continued; and he may make such rules and regulations and establish such service as will . . . regulate their occupancy and use to preserve the forests thereon from destruction....

Id. at 602.[6]  The Court concluded, therefore, that the Srnsky's common law easement was not subject to federal regulation.  Id. at 604 ("We have only the deed to look to in determining the rights of the parties, and, absent federal legislation purporting to control interpretation of the deed, we are left with state law.").

Also relevant to the present inquiry is Sierra Club v. Penfold, 857 F.2d 1307 (9th Cir. 1988), wherein plaintiffs challenged Bureau of Land Management regulations that allowed certain mining operations that involved minimal disturbance to the surface (known as "Notice" mines) to proceed without BLM approval so long as advance notice of the proposed activities was provided.  Under this procedure, the BLM, after receiving the requisite notice of the proposed activity, would issue a letter indicating that mining operations could proceed.  The plaintiffs argued that the BLM's review of these mines "constitute[d] 'regulation' and 'approval' which is 'major federal action' under NEPA thereby requiring an EA on every proposed Notice mine." Id. at 1313.  The Ninth Circuit disagreed:

> We believe BLM does not sufficiently involve itself in the approval process to render Notice mine review a major Federal action requiring NEPA compliance.  Without NEPA's applicability, an EA on each Notice mine is not required.
>
> *     *     *     *     *     *     *
>
> BLM cannot require approval before an operation can commence developing the mine. 43 C.F.R. § 3809.1-3(b). BLM's obligation to monitor compliance with statutory and regulatory requirements to deter undue degradation is insufficient. San Francisco Tomorrow v. Romney, 472 F.2d 1021, 1025 (9th Cir.1973). The right of BLM to issue notices of noncompliance is also insufficient action. Molokai Homesteaders Cooperative Association v. Morton, 506 F.2d 572, 580 (9th Cir.1974). While BLM does possess the authority to commence enforcement proceedings, see 43 C.F.R. § 3809.3-2, the CEQ has established that actions " do not include bringing judicial or administrative civil or criminal enforcement actions." 40 C.F.R. § 1508.18(a) (emphasis added). See also Alaska, 591 F.2d at 537.

---

[6]   "Courts generally adhere to the principle that statutes relating to the same subject matter should be construed harmoniously if possible, and if not, that more recent or specific statutes should prevail over older or more general ones." Tug Allie-B, Inc. v. U.S., 273 F.3d 936, 941 (11th Cir. 2001) (citing Southern Natural Gas Co. v. Land, Cullman County, 197 F.3d 1368, 1373 (11th Cir. 1999).

> We hold that as a matter of law BLM's approval of Notice mines
> without an EA does not constitute major Federal action within the
> scope of NEPA, 42 U.S.C. § 4332(2)(c), or the CEQ implementing
> regulations, 40 C.F.R. § 1508.18. Neither BLM's approval process
> nor regulatory involvement is sufficient to trigger NEPA or
> ANILCA application.

Id. at 1314.  Indeed, the 1991 OGC legal opinion relied in part on Penfold in concluding that the

Forest Service did not have the authority to regulate access to private oil and gas rights.  (Plaintiffs'

Ex. G, p. 5-6) ("The Allegheny situation is well within the ambit of the decision in Penfold. . . . In

accordance with Penfold then, the exercise of . . . oil and gas rights is not a federal action for

purposes of NEPA.").  See also Mineral Policy Center, 292 F.Supp.2d 30, 56 (D.D.C. 2003) (relying

on Penfold and concluding that private projects on federal land which do not require federal

regulatory action are not subject to NEPA).

Penfold is also consistent with Third Circuit precedent holding that "[f]ederal approval of

a private party's project, where that approval is not required for the project to go forward, does not

constitute a major federal action" triggering NEPA.  State of New Jersey Dep't. of Envtl. Prot. v.

Long Island Power Auth., 30 F.3d 403, 417 (3rd Cir. 1994).  In Long Island, the Court held that the

Coast Guard's review and approval of a private shipping plan that did not require a federal permit

or license was not a major federal action.  Long Island, 30 F.3d at 417; see also NAACP v. Medical

Center, 584 F.2d 619, 633 (3rd Cir. 1979) (NEPA does not apply to an agency's "approval" of a

private project where "the agency's approval is not legally required," even if the approval in some

sense "enabled" the private action to proceed).

In sum, for the reasons previously discussed, I conclude that the Forest Service does not

possess the regulatory authority that it asserts relative to the processing of oil and gas drilling

proposals.  Consequently, its involvement in the approval process does not constitute a major federal

action requiring NEPA compliance.  The Weeks Act, which has never been abrogated, Pennsylvania

common law relative to split-estates, as well as almost thirty years of cooperative interaction

consistent with the dictates of Minard Run, circumscribe the Forest Service's authority in this area.

While the Forest Service's authority is limited, it can nevertheless effectively exercise its obligation

to prevent undue degradation to the surface estate through the interactive model delineated in <u>Minard Run</u>.  In addition, it retains all of the rights of a servient estate holder under Pennsylvania law, including the right to seek appropriate judicial intervention where necessary to protect its interests.

For the reasons previously discussed,  I find that Plaintiffs Minard Run and POGAM have demonstrated a reasonable likelihood of success on the merits of their substantive claims.

### b) Procedural challenge

The APA requires public notice and comment procedures before a legislative rule can be adopted or changed.  5 U.S.C. §§ 551(5), 553; <u>Cooper University Hosp. v. Sebelius</u>, 2009 WL 3234625 (3rd Cir. 2009).  "The essential purpose of according . . . notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies."  <u>Dia Nav. Col, Ltd. v. Pomeroy</u>, 34 F.3d 1255, 1265 (3rd Cir. 1994).  Thus, an agency seeking to introduce a new legislative rule "must publish a notice of proposed rulemaking in the Federal Register, which is the guide for those members of the public - usually special interest groups - who want to participate in the rulemaking process."  <u>Riverbend Farms, Inc. v. Madigan</u>, 958 F.2d 1479, 1484 (9th Cir. 1992).  The notice must contain "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b).  Although the APA mandates no minimum comment period, "some window of time, usually thirty days or more, is then allowed for interested parties to comment."  <u>Petry v. Block</u>, 737 F.2d 1193, 1201 (D.C. Cir.1984).

The Forest Service argues that notice and comment procedures are unnecessary since no final agency action was involved.  Having concluded to the contrary, I find that Plaintiffs are likely to succeed on the merits of their procedural APA claim.

### 2.        Irreparable Harm

Having concluded that Plaintiffs Minard Run and POGAM have provided sufficient evidence of injury-in-fact to satisfy the jurisdictional requirement of standing, I now consider whether the harm alleged is irreparable.  A plaintiff seeking an injunction has the burden of proving a "clear showing of immediate irreparable injury." Continental Group, Inc. v. Amoco Chemicals Corp., 614 F.2d 351, 359 (3rd Cir.1980). The "requisite feared injury or harm must be irreparable - not merely serious or substantial," and it "must be of a peculiar nature, so that compensation in money cannot atone for it." Glasco v. Hills, 558 F.2d 179, 181 (3rd Cir.1977).

As previously discussed, POGAM members (and Minard Run) have suffered significant financial losses as a result of the Forest Service's decision to halt drilling while an EIS is performed. In addition to those injuries, there is substantial evidence that several oil and gas related businesses that rely upon drilling in the ANF for their livelihood may be forced out of business if the drilling ban continues into mid-summer of 2010.  "Where the economic loss involved would be so great as to threaten destruction of the moving party's business, a preliminary injunction should be issued to maintain the status quo."  See N.W. Controls v. Outboard Marine Corp., 317 F.Supp. 698, 703 (D. Del. 1970).  See also Doran v. Salem Inn, Inc., 422 U.S. 922 (1975); Newlife Homecare Inc. v. Express Scripts, Inc., 2007 WL 1314861, *4 (M.D. Pa. 2007) ("[S]ubstantial loss of business and the threat of bankruptcy can be sufficient for a finding of irreparable harm."); City of Los Angeles v. County of Kern, 462 F.Supp.2d 1105 (C.D. Cal. 2006) ("The risk of total business failure and the difficulty of quantifying losses if the business survives means RBM has demonstrated a risk of irreparable harm."); see also Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380 (11th Cir.1984)("A damages remedy can be inadequate [if] [t]he damage award may come too late to save the plaintiff's business.").

Moreover, "when 'interests involving real property are at stake, preliminary injunctive relief can be particularly appropriate because of the unique nature of the property interest.'" RoDa Drilling Company v. Siegal, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting 2660 Woodley Road Joint Venture v. ITT Sheraton Corp., 1998 WL 1469541, *6 (D.Del. 1998)).  In RoDa Drilling, a case

concerning ownership of oil and gas producing properties, the 10th Circuit found irreparable harm due to the plaintiff's inability to access its property interests:

> [T]hese properties are income producing, and realizing their income potential depends upon active management of the properties. That makes potential damages most difficult to prove, if not practically unquantifiable. . . . Decisions concerning drilling, joint operating agreements, sales, farm-outs, operators, and the like must be made day to day. In addition, RoDa has been unable to rely on the properties to finance its expenditures . . .

Id. at 1211. See also Pelfresne v. Village of Williams Bay, 865 F.2d 877, 883 (7th Cir. 1989) ("As a general rule, interference with the enjoyment or possession of land is considered "irreparable" since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute.").

In light of the foregoing, I conclude that Plaintiffs Minard Run and POGAM have made a clear showing of irreparable harm as a result of the drilling ban.

### 3.      Balance of the Equities

In considering this factor, a court "must undertake to balance the hardships to the respective parties." Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3rd Cir.1998). The Forest Service contends that if the injunction is granted, it will materially interfere with its ability to effectively protect its surface estate.

In contrast, Plaintiffs contend that the continued denial of access to privately held property rights and the irreparable harm flowing therefrom if the injunction is denied imposes a far more significant hardship on them than would a return to the status quo on the Forest Service.

Here, I find that the balance of equities favors the Plaintiffs. The harm experienced by the Plaintiffs as a result of the drilling ban is, in my view, concrete and irreparable. On the other hand, a return to the status quo of Minard Run would not pose a threat to the ability of the Forest Service to adequately protect its surface estate. In this regard, it is significant that for the many years where the Minard Run framework was utilized, the Forest Service never found it necessary to seek judicial

intervention as a result of a perceived threat to its interests.  Nor does the grant of injunctive relief preclude the Forest Service from completing a comprehensive study of oil and gas drilling in the ANF to more effectively address its environmental concerns as part of the <u>Minard Run</u> interactive process with the mineral estate holders.

### 4.      Public Interest

The final factor to consider is whether the public interest favors the issuance of a preliminary injunction.  The Third Circuit has noted that, "if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." <u>American Telephone and Telegraph Co. v. Winback and Conserve Program, Inc.</u>, 42 F.3d 1421, 1427 n. 8 (3rd Cir.1994).  Such is the case here.

The ANF is a unique and valuable resource that offers a host of recreational activities for the public.  There is a clear public interest in preserving it for present and future generations.  There is also a clear public interest in preventing unreasonable interference with private property rights.  These interests are not mutually exclusive.  Both can be accommodated through the type of cooperative interaction that had been the hallmark of the <u>Minard Run</u> approach for almost three decades.

### <u>ORDER</u>

Consistent with the foregoing Findings of Fact and Conclusions of Law, the following Order is hereby entered:

1.      Defendants' Motion to Dismiss is granted as to Plaintiffs Warren County and AFA and denied as to Plaintiffs POGAM and Minard Run.

2.      The Forest Service is preliminarily enjoined from requiring the preparation of a NEPA document as a precondition to the exercise of private oil and gas rights in the ANF.

3.   Enforcement of the forest-wide drilling ban in the ANF is hereby preliminarily enjoined.

4.   Proposals for drilling activity shall instead be processed forthwith in the same form and manner in which they had been prior to the inception of the drilling ban and consistent with the procedures set forth in  United States v. Minard Run Oil Co., 1980 U.S. Dist. LEXIS 9570 (W.D. Pa. 1980) and 30 U.S.C . § 226(o).

5.   Further implementation of the Settlement Agreement is hereby preliminarily enjoined.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MINARD RUN OIL COMPANY,                 )
PENNSYLVANIA OIL AND GAS                )
ASSOCIATION, ALLEGHENY FOREST           )
ALLIANCE, and WARREN COUNTY,            )
                                        )
                                        )
                    Plaintiffs,         )
        v.                              )          C.A. No. 09-125 Erie
                                        )          Judge McLaughlin
                                        )
UNITED STATES FOREST SERVICE,           )
*et al.*,                               )
                                        )
                    Defendants.         )

**<u>ORDER</u>**

        And now this 15th day of December, 2009, consistent with the Findings of Fact and
Conclusions of Law set forth in the accompanying Memorandum Opinion, the following Order is
hereby entered:

1.      Defendants' Motion to Dismiss is granted as to Plaintiffs Warren County and AFA
        and denied as to Plaintiffs POGAM and Minard Run.

2.      The Forest Service is preliminarily enjoined from requiring the preparation of a
        NEPA document as a precondition to the exercise of private oil and gas rights in the
        ANF.

3.      Enforcement of the forest-wide drilling ban in the ANF is hereby preliminarily
        enjoined.

4.      Proposals for drilling activity shall instead be processed forthwith in the same form
        and manner in which they had been prior to the inception of the drilling ban and

consistent with the procedures set forth in <u>United States v. Minard Run Oil Co.</u>, 1980 U.S. Dist. LEXIS 9570 (W.D. Pa. 1980) and 30 U.S.C . § 226(o).

5.       Further implementation of the Settlement Agreement is hereby preliminarily enjoined.

/s/ Sean J. McLaughlin_____<br>United States District Judge

cm: All parties of record. ___