IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MINARD RUN OIL COMPANY, PENNSYLVANIA OIL AND GAS ASSOCIATION, ALLEGHENY FOREST ALLIANCE, and WARREN COUNTY, <br><br> Plaintiffs, <br> v. <br><br> UNITED STATES FOREST SERVICE, *et al.*, <br><br> Defendants. | C.A. No. 09-125 Erie <br> Judge McLaughlin |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

This matter is before the Court upon Plaintiff Pennsylvania Independent Oil and Gas Association's ("PIOGA") Motion for an Order to Show Cause Why Defendant Forest Service Should Not Be Held in Contempt ("Contempt Motion"). Having conducted a hearing, and for the reasons which follow, PIOGA's request that the Forest Service be held in contempt is denied.

## BACKGROUND

Prior to 2009, access to private mineral rights in the Allegheny National Forest ("ANF") occurred as the result of a cooperative process between private mineral owners and the United States Forest Service ("Forest Service"):

> Although the Service manages the surface of the ANF for the United States, mineral rights in most of the ANF are privately owned. Mineral rights owners are entitled to reasonable use of the

1

surface to drill for oil or gas and from 1980 until recently the Service and mineral owners had managed drilling in the ANF through a cooperative process. Mineral rights owners would provide 60 days advance notice to the Service of their drilling plans and the Service would issue owners a Notice to Proceed (NTP), which acknowledged receipt of notice and memorialized any agreements between the Service and the mineral owner about the drilling operations.

Minard Run Oil Co. v. U.S. Forest Service, 2011 WL 4389220, *1 (3rd Cir. 2011) ("Minard Run III"). The cooperative process described by the Third Circuit derived from this court's decision in United States v. Minard Run Oil Co., 1980 U.S. Dist. Lexis 9570 (W.D. Pa. 1980) ("Minard Run I"). In Minard Run I, the court, recognizing that the owner of mineral rights has an "unquestioned right" to enter a property to access and extract his minerals, but must do so in a manner which reduces unnecessary disturbance of the surface estate, required oil and gas drillers to provide the Forest Service with five specific pieces of information "no less than 60 days in advance" of commencing drilling operations. Id. at *13, 19-20. This so-called "Minard Run framework" became standard practice in the ANF and governed relations between drillers and the Forest Service from 1980 until approximately 2009. See Minard Run III, 2011 WL 4389220, *3.

Unfortunately, this process began to unravel in 2009 when the Forest Service settled a lawsuit filed by the Sierra Club and the Forest Service Employees for Environmental Ethics ("FSEEE") by agreeing to perform an environmental analysis pursuant to the National Environmental Policy Act ("NEPA") prior to issuing NTPs for future drilling proposals. FSEEE, 2009 WL 1324154. Consistent with that Settlement Agreement, former (then current) Forest Supervisor Leanne Marten subsequently

2

issued a statement (the "Marten Statement") indicating that the Forest Service intended to perform a forest-wide environmental assessment prior to authorizing activity on any future drilling proposals. See Minard Run II, 2009 WL 4937785 at *11-12. The Forest Service justified this hiatus on private drilling activities in the ANF by taking the position that mineral rights owners were *required* to obtain an NTP prior to making any changes to land in the ANF. Id. Owners of private mineral and gas rights in the ANF responded by filing an action in this Court seeking to enjoin the Forest Service from implementing the Settlement Agreement and the accompanying Marten Statement. See Minard Run II, 2009 WL 4937785.

On December 15, 2009, we issued a preliminary injunction order enjoining the Forest Service from "requiring the preparation of a NEPA document as a precondition to the exercise of private oil and gas rights in the ANF" and from "[e]nforcement of the forest-wide drilling ban in the ANF." See Minard Run II, 2009 WL 4937785 at *34. The preliminary injunction order further stated that "[p]roposals for drilling activity shall instead be processed forthwith in the same form and manner in which they had been prior to the inception of the drilling ban and consistent with the procedures set forth in [Minard Run I]." Id.

On January 12, 2010, Defendants filed a "Motion for Reconsideration or in the Alternative to Alter or Amend Judgment" ("Motion for Reconsideration"). In the Motion for Reconsideration, Defendants raised several grounds for reconsideration and alternatively requested that we "clarify the procedures for processing drilling proposals under the preliminary injunction order." (Memorandum in Support of Motion for Reconsideration or in the Alternative to Alter or Amend Judgment, Dkt. 48, p. 1). In a hearing on March 9, 2010, we denied Defendants' Motion for Reconsideration but offered the following, on the record, by way of clarification:

3

> As has been recognized by all parties, my previous opinion reaffirmed what I referred to as the "Minard Run approach," which included a 60 day notice requirement derived from the holding in the prior <u>Minard Run</u> case. However, my order did not, and was not intended to, grant the drillers carte blanche to enter the ANF and commence drilling operations on the 61st day if unable to reach an accommodation with the Forest Service. This is because, while my opinion recognized that mineral estates are dominant, it also specifically held that Pennsylvania law requires the owner of the dominant mineral estate to exercise due regard for the servient estate so as to avoid and prevent undue damage to the surface. I want to make it clear that forbearance on the part of the drillers during the initial 60 day is not in and of itself synonymous with "due regard." Depending upon the unique circumstances of any given case, a period of time longer than 60 days may be entirely appropriate and necessary in order for the dominant and servient estateholders to engage in a meaningful and cooperative accommodative effort.
>
> If after a good-faith attempt a mutually acceptable accommodation cannot be reached, the Forest Service may, consistent with my previous opinion and, indeed, the action it took in <u>Minard Run I</u>, seek injunctive relief in an appropriate judicial forum to protect the surface estate.

(Order on Motion for Reconsideration, 3/9/2010, Dkt. 59, pp. 8-9).

The Forest Service, Sierra Club, and FSEEE filed interlocutory appeals. On September 20, 2011 the Third Circuit unanimously affirmed the preliminary injunction. <u>Minard Run III</u>, 2011 WL 4389220, *1. The Third Circuit characterized the preliminary injunction as enjoining the Forest Service "from requiring the preparation of a NEPA document as a precondition to the exercise of private oil and gas rights in the ANF" and as requiring a "return to the 60-day cooperative framework for processing NTPs that had been in place prior to the FSEEE Settlement." <u>Id</u>. at 10. After reviewing applicable property law concerning split estates, the Court held:

4

> [T]he Service does not have the broad authority it claims over private mineral rights owners' access to surface lands. Its special use regulations do not apply to outstanding rights and the limited regulatory scheme applicable to the vast majority of reserved rights in the ANF [limiting the Forest Service to "regulations contained in the written instrument of conveyance"] does not impose a permit requirement. Although the Service is entitled to notice from owners of these mineral rights prior to surface access, and may request and negotiate accommodation of its state-law right to due regard, *its approval is not required for surface access*. An NTP is an acknowledgment that memorializes any agreements between the Service and a mineral rights owner, but it is not a permit. Accordingly, in the record before it, the District Court properly concluded that issuance of an NTP is not a "major federal action" under NEPA and an EIS need not be completed prior to issuing an NTP.

Id. at *10-12 (emphasis supplied).

On July 15, 2011, PIOGA filed the instant motion to hold the Forest Service in contempt of this Court's preliminary injunction order. In the Contempt Motion, PIOGA argues that the Forest Service has violated the preliminary injunction by (1) refusing to allow PIOGA member Shell Western Exploration and Production, Inc. ("SWEPI") to utilize groundwater located on ANF land in the production of gas contained in Marcellus shale deposits, and (2) "engaging in a pattern of unwarranted and increasing delays before issuing [NTPs] for private oil and gas developments on split estates." (See PIOGA's Post-Hearing Proposed Findings of Fact and Conclusions of Law, p. 10). An evidentiary hearing on this matter was held on November 14-15, 2011. The following represent our Findings of Fact and Conclusions of Law.

## **FINDINGS OF FACT**

1. Pursuant to the cooperative framework established in <u>Minard Run I</u> and reaffirmed by this Court and the Third Circuit, oil and gas drillers must provide the Forest Service with the following five pieces of information at least 60 days in advance of any proposed drilling activity: (1) identification of a designated field representative; (2) "[a] map showing the location and dimensions of all improvements including but not limited to well sites and road and pipeline accesses;" (3) "[a] plan of operations, of an interim character if necessary, setting forth a schedule for construction and drilling"; (4) an erosion and sedimentation control plan; and (5) "[p]roof of ownership of mineral title." <u>Minard Run I</u>, 1980 U.S. Dist. Lexis 9570, *22-23.

2. The 60-day time frame set forth in <u>Minard Run I</u> does not begin to run until all five pieces of information have been received by the Forest Service. (Transcript, pp. 68-69, 124-126).

3. When the Forest Service receives any of the aforementioned pieces of information from a driller in conjunction with a concrete drilling proposal, it assigns a case number to the proposal and opens a case file. (Hearing Transcript, 11/14/11 (hereinafter, "Transcript"), pp.123-25).

4. The Forest Service characterizes this first submission of information from a driller as an "initial notification." (Seyler Decl., ¶ 8).

5. The information conveyed in an initial notification from a driller might consist of as little as a map or an email indicating where the driller intends to drill. (Seyler Decl., ¶ 9).

6. The mere fact that a file is opened, therefore, does not mean that the Forest Service has received all of the required pieces of Minard Run I documentation. (Transcript, pp. 125-26).

7. Relative to some of the drilling proposals at issue in the contempt hearing, there were times when the Forest Service received initial notification of a drilling proposal and opened a file but did not receive all five pieces of information required by Minard Run I until "several months" after initial notification. (Seyler Decl., ¶ 13).

8. While the Forest Service is often able to begin reviewing a drilling proposal before all of the Minard Run I pieces of information have been received, the initial notification from the driller is not always sufficiently specific for the Forest Service to begin reviewing the proposal. (Seyler Decl., ¶ 14).

9. Prior to the FSEEE Settlement Agreement, the Forest Service typically processed over 90 percent of the drilling requests that they received within 60 days. Minard Run II, 2009 WL 4937785, *8-9 (crediting the testimony of Earnest Rozelle, ANF land staff officer from 1986-1999, David Fredley, mineral specialist in the ANF from 1981-1997, and David Wright, ANF Forest Supervisor from 1987-1992, that during each of their tenures in the ANF, over "90 percent" of drilling proposals were processed within 60 days).

10. Christian Kuntz, President and CEO of PIOGA member Pennsylvania General Energy ("PGE") testified that, prior to the FSEEE settlement, his company

typically received an NTP "within 45-60 days of submitting a well proposal." (Transcript, p. 48).

11. Based on records received from the Forest Service in response to a Freedom of Information Act ("FOIA") request by PIOGA, only a handful of the drilling proposals submitted to the Forest Service between December 15, 2009 and October 1, 2011 were issued within or near 60 days of initial notification. (See Kuntz Supplemental Decl., Exhs. 6-8; Transcript, pp. 56-59). For example, a chart displaying eight new drilling proposals submitted to the Forest Service between December 15, 2009 and July 25, 2010 reveals that it took approximately 120 days to process those proposals following initial notification. (Defendant's Hearing Ex. 2; Transcript, pp. 230-32).

12. Similarly, out of 25 new drilling proposals processed by the Forest Service between July 15, 2010 and May 1, 2011, only two were processed within 60 days of initial notification with the average processing time being approximately 213 days. (Defendant's Hearing Ex. 2; Transcript, pp. 230-32).

13. Based primarily upon his review of the processing times contained in the data provided by the Forest Service pursuant to the FOIA request, Kuntz testified that it is currently taking approximately "six months" to receive a NTP from the Forest Service. (Transcript, p. 51).

14. Kuntz testified that, based on his company's experience working in the ANF, the current processing times for NTPs were not consistent with the manner in which

they had been processed prior to the FSEEE settlement. (Transcript, pp. 48-49).

15. The charts submitted by PIOGA in support of their contention that the Forest Service is unreasonably delaying issuing NTPs calculates the time from the receipt of an "initial notification" rather than the date on which all five pieces of Minard Run I information were submitted to the Forest Service. (Transcript, pp. 67-68, 145-46, 307-08, 318).

16. As to certain wells, the Forest Service supplied evidence that some delays in the issuance of NTPs were attributable to the drillers. For example, Seyler testified that drillers are responsible for clearly staking or marking a proposed drill site to identify where the driller intends to physically disturb the surface of the ANF so that the Forest Service can identify potential impacts to ANF resources. (Seyler Decl., ¶ 18; Transcript, pp. 127-28). As an example, Seyler cited one project where a driller failed to stake the location of wells until approximately 103 days after "initial notification." (Seyler Decl., ¶ 30; Transcript, pp. 127-28).

17. The issuance of an NTP may also be delayed where a driller fails to sign a timber contract or pay its timber bill in a timely fashion. (Seyler Decl., ¶¶26, 30; Transcript, pp. 174-75). In one instance, Seyler noted that the Forest Service did not receive a signed timber contract until 70 days after it was sent to the driller and did not receive payment on the contract for 62 days after a bill was sent. (Seyler Decl., ¶ 30; Transcript, pp. 127-28).

18. Other specific examples of delay cited by Seyler included instances where drilling proposals failed to provide proof of land ownership, failed to provide an erosion or sedimentation control plan, or failed to apply for required commercial road use permits. (Seyler Decl., ¶ 30; Transcript, pp. 128-30). These delays ranged between 29 and 116 days in the examples cited by the Forest Service. (Seyler Decl., ¶ 30).

19. Other potential delays affecting the issuance of an NTP include requests from a driller to place a drilling proposal "on hold" indefinitely, revisions of drilling proposals, inconsistent statements from drillers as to their intended drilling activities, and requests to prioritize certain proposals more highly than others. (Transcript, pp. 126-27, 174-177).

20. The issue of the legal status of groundwater in the ANF as it relates to the rights of the Forest Service and/or the private mineral owners to utilize it was not at issue in Minard Run II and formed no part of our opinion or that of the Third Circuit in Minard Run III. See Minard Run II, 2009 WL 4937785; Minard Run III, 2011 WL 4389220.

## **CONCLUSIONS OF LAW**

In order to find civil contempt, "[a] court must find that (1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order." John T. ex rel. Paul T. v. Delaware County Intermediate Unit, 318 F.3d 545, 552 (3rd Cir. 2003) (quoting Harris v. City of Philadelphia, 47 F.3d 1311, 1326 (3rd

Cir. 1995)).  Each of these three elements must be proven by "clear and convincing" evidence, and "ambiguities must be resolved in favor of the party charged with contempt."  John T, 318 F.3d at 552 (quoting Robin Woods, Inc. v. Woods, 28 F.3d 396, 399 (3rd Cir. 1994)).  "Willfullness is not a necessary element of civil contempt," see John T., 318 F.3d at 552, and thus, "good faith is not a defense."  Robin Woods, 28 F.3d at 399.

"Clear and convincing evidence" is an exacting evidentiary standard which requires a party to adduce evidence which is "so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction without hesitancy, of the truth of the precise facts in issue."  N.J. Sports Prods. v. Don King Prods., 15 F.Supp.2d 546, 551 (D.N.J. 1988) (quoting Cruzan v. Mo. Dep't of Health, 497 U.S. 261, 285 n. 11 (1990)).  Moreover, an order which forms the basis of a civil contempt finding must be "clear and unambiguous" in light of the "longstanding, salutary rule in contempt cases . . . that ambiguities and omissions in orders rebound to the benefit of the person charged with contempt."  See King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2nd Cir. 1995); United States v. Christie Indus. Inc., 465 F.2d 1002, 1006 (3rd Cir. 1971).  See also F.T.C. v. Lane Labs-USA, Inc., 624 F.3d 575, 582 (3rd Cir. 2010) (nothing that "courts should hesitate to adjudge a defendant in contempt when 'there is ground to doubt the wrongfulness of the conduct'") (quoting Robin Woods, 28 F.3d at 399; Quinter v. Volkswagen of Am., 676 F.2d 969, 974 (3rd Cir. 1982)).

To prevail on its claim of contemptuous delay, PIOGA must demonstrate by clear and convincing evidence that the manner in which the Forest Service has processed NTPs subsequent to the issuance of the preliminary injunction order violates a clear directive contained therein.  As noted above, the central legal issue addressed in that order was whether the exercise of private oil and gas rights in the ANF

11

represented a "major federal action" that triggered the requirements of NEPA. Based on our review of applicable Pennsylvania and federal law, we concluded that the Forest Service lacked sufficient regulatory control over the processing of oil and gas drilling proposals to establish any approval process that would constitute a major federal action requiring NEPA compliance. Consequently, we ordered the Forest Service to return to processing proposals in the "same form and manner in which they had been prior to the inception of the drilling ban" and consistent with Minard Run I. We find, contrary to the Forest Service's contention, that the preliminary injunction order, when viewed against the larger historical backdrop, was clear and unambiguous.

Historically, approximately 90-95% of the drilling proposals received by the Forest Service were processed within 60 days. Minard Run II, 2009 WL 4937785, *8-9. Delays beyond 60 days were rare and generally were the product of ongoing and amicable negotiations between the Forest Service and the private mineral owners. Id. Thus, a pervasive and persistent pattern of excessive delay beyond the 60-day period in issuing NTPs, after receipt of the requisite Minard Run I information, would violate our preliminary injunction order.

Although the Court is concerned that there is some evidence to suggest that delay has replaced diligence as the hallmark of the Forest Service's processing of drilling proposals, it is important to stress that civil contempt must be proven by clear and convincing evidence. To reiterate, the clock against which unreasonable delay must be measured does not begin to "tick" until all of the information required by Minard Run I has been supplied. PIOGA has failed to present clear and convincing evidence as to this critical point and, in contrast, the Forest Service has supplied some credible evidence that the mineral owners have, in various particulars, contributed to the delay in the issuance of NTPs. Consequently, we conclude that PIOGA has failed to carry its

burden of proof in support of its contention that the Forest Service has contemptuously violated our order that it process proposals in the "same form and manner in which they had been prior to the inception of the drilling ban."

With respect to the issue of groundwater, we similarly find no basis for a finding of contempt. Nothing in our December 15, 2009 preliminary injunction order or the Third Circuit's opinion affirming the injunction addressed any issues concerning groundwater usage or the legal status of groundwater within the ANF. Rather, as previously noted, the central legal issue addressed in the issuance of the preliminary injunction was whether the Forest Service could "require[e] the preparation of a NEPA document as a precondition to the exercise of private oil and gas rights in the ANF." Minard Run II, 2009 WL 493 7785, *34. The preliminary injunction order did not address or consider any issues relative to groundwater, much less issue any order regarding the same. Consequently, the position taken by the Forest Service with respect to SWEPI's proposed groundwater use does not form the basis for a finding of contempt.

## **CONCLUSION**

We have previously cautioned that forbearance on the part of the mineral owners beyond the initial 60-day period, while not legally required, may be practically advisable in order to exercise appropriate "due regard" for the Forest Service's estate. We also stress, however, that the Forest Service's processing of drilling proposals consistent with the Minard Run paradigm and our directive in Minard Run II should not be viewed by the Forest Service as merely an aspirational goal. It is required. Unreasonable delay by the Forest Service beyond the 60-day period increases the likelihood that mineral owners will simply choose, as would be their right, to commence

drilling activities prior to the completion of the interactive process. As a result, in the absence of filing its own lawsuit, the Forest Service could lose its ability, with respect to any given well package, to supply meaningful input concerning issues it considers important to preserving the integrity of its servient estate. As has always been the case, the successful resolution of drilling-related disputes on an informal basis and the avoidance of future litigation depend entirely on the good faith and cooperative efforts of both parties.

/s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MINARD RUN OIL COMPANY, PENNSYLVANIA OIL AND GAS ASSOCIATION, ALLEGHENY FOREST ALLIANCE, and WARREN COUNTY, <br><br>        Plaintiffs,<br>  v.<br><br>UNITED STATES FOREST SERVICE, *et al.*,<br><br>        Defendants. | C.A. No. 09-125 Erie<br>Judge McLaughlin |

**ORDER**

AND NOW, this 23rd day of March, 2012, for the reasons set forth in the accompanying Memorandum Opinion, Plaintiff's request that the Forest Service be held in contempt is DENIED.

IT IS SO ORDERED.

                                              /s/ - Sean J. McLaughlin
                                              United States District Judge

cm:    All parties of record.