**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MINARD RUN OIL COMPANY, PENNSYLVANIA OIL AND GAS ASSOCIATION, ALLEGHENY FOREST ALLIANCE, and WARREN COUNTY, ) ) ) ) ) ) | |
| Plaintiffs, ) | |
| v. ) | C.A. No. 09-125 Erie Judge McLaughlin |
| ) | |
| UNITED STATES FOREST SERVICE, *et al.*, ) ) | |
| Defendants. ) | |

## <u>MEMORANDUM OPINION</u>

McLAUGHLIN, SEAN J., J.


This matter is before the Court upon a Motion for Summary Judgment and for Permanent Injunction filed by Plaintiffs Minard Run Oil Company ("Minard Run") and the Pennsylvania Independent Oil and Gas Association ("PIOGA") (collectively, "Plaintiffs") and a Motion for Summary Judgment filed by Defendants Allegheny Defense Project, the Sierra Club, and the Forest Service Employees for Environmental Ethics ("FSEEE") (collectively, "the FSEEE Defendants"). This Court has jurisdiction pursuant to 5 U.S.C. §§ 701-706 and 28 U.S.C. § 1331.


## I.   PROCEDURAL BACKGROUND

The original complaint in this action was filed on June 1, 2009, followed by a motion for preliminary injunction on June 2, 2009.  (Dkt. ## 1, 2).  After a

three-day evidentiary hearing, this Court granted the Plaintiffs' request for preliminary injunctive relief by memorandum opinion and order dated December 15, 2009.   See Minard Run Oil Co. v. U.S. Forest Service, 2009 WL 4937785 (W.D. Pa. 2009) ("Minard Run II").   The Third Circuit affirmed the grant of the preliminary injunction on September 20, 2011.   See Minard Run Oil Co. v. U.S. Forest Service, 670 F.3d 236 (3rd Cir. 2011) ("Minard Run III").   In order to place the Plaintiffs' and FSEEE Defendants' motions for summary judgment in the appropriate context, a more in depth review of the history of this litigation is warranted.

At its core, this lawsuit involves a dispute between the FSEEE Defendants and private owners of mineral and oil rights in the Allegheny National Forest ("ANF") concerning the procedure by which the private mineral owners exercise their rights to extract oil and gas in the ANF.   These mineral estates exist in two distinct categories: "reserved" mineral rights, and "outstanding" mineral rights. See Minard Run II, 2009 WL 4937785, *3.   "Reserved mineral rights were created when the fee owner transferred the surface estate to the federal government and retained the mineral estate," whereas outstanding mineral rights "were created when the surface estate and the mineral estate were severed from one another in a transaction between private parties prior to the federal government's acquisition of the surface estate."   Id. at *3-4.

Prior to the events which precipitated this litigation, access to private mineral rights in the ANF (both reserved and outstanding) had traditionally occurred as the result of a cooperative process between private mineral owners and the United States Forest Service ("Forest Service").   The genesis of this

cooperative approach was the district court decision in United States v. Minard Run, 1980 U.S. Dist. Lexis 9570 (W.D. Pa. 1980) ("Minard Run I"), wherein the court concluded that, under Pennsylvania common law, an owner of private mineral rights has an "unquestioned right" to enter a property to access and extract his minerals, but must do so in a manner which exercises "due regard" for the rights of the surface estate. Id. at *13. In order to balance those interests, the court ordered oil and gas drillers to provide the Forest Service with several specific pieces of information concerning any drilling proposal "no less than 60 days in advance" of commencing drilling operations. Id. at *13, 19-20. The Forest Service, upon receiving this information, would review the proposal and, if necessary, address any concerns with the driller to so as to prevent unnecessary or harmful surface use. See Minard Run III, 670 F.3d at 244 (describing the mechanics of the so-called "Minard Run framework"). Thereafter, the Forest Service would issue a "Notice to Proceed" ("NTP") acknowledging that notice had been properly given and memorializing any agreements between the parties concerning the proposed drilling operation. Id. The Minard Run framework became standard practice in the ANF and governed relations between drillers and the Forest Service from 1980 until approximately 2009. Id.

      A.    The Original FSEEE Action ("FSEEE")

On November 20, 2008, the FSEEE Defendants filed suit against the Forest Service in this Court seeking a declaration that the practice of issuing NTPs without conducting an appropriate environmental analysis or filing an environmental impact study ("EIS") pursuant to the National Environmental Policy

Act of 1969, 42 U.S.C. § 4321 *et seq*. ("NEPA"), was contrary to federal law. See FSEEE v. U.S. Forest Service, No. 08-323, 2009 WL 1324154 (W.D. Pa. 2009).   The FSEEE Defendants also sought to enjoin the Forest Service from issuing any further NTPs without first conducting the proper NEPA analysis.   Id. On April 9, 2009, the Forest Service and the FSEEE Defendants entered into a Settlement Agreement containing the following provision:

> [The Service] agrees that it shall undertake appropriate NEPA analysis prior to issuing Notices to Proceed, or any other instrument authorizing access to and surface occupancy of the Forest for oil and gas projects on split estates including both reserved and outstanding mineral interests.   Appropriate NEPA analysis shall consist of the use of a categorical exclusion or the preparation of an Environmental Assessment or an Environmental Impact Assessment.

Minard Run III, 670 F.3d at 245.   On the following day, April 10, 2009, former (then current) Forest Supervisor Leanne Marten issued a statement (the "Marten Statement") indicating that the Forest Service would not authorize activity on any new drilling proposals until it had completed a "forest-wide site-specific environmental analysis."   Id.

B.    The Preliminary Injunction Action ("Minard Run II")

On June 1, 2009, Plaintiffs, along with the Allegheny Forest Alliance ("AFA") and the County of Warren, filed the instant action challenging the

Settlement Agreement and the contemporaneous Marten Statement and seeking to enjoin the Forest Service from restricting or barring drilling activities during the preparation of a forest-wide EIS.   As a procedural matter, Plaintiffs argued that the Settlement Agreement and the Marten Statement constituted final agency action subject to review pursuant to the Administrative Procedure Act ("APA") because they represented a dramatic change in the manner in which the Forest Service and oil and gas drillers had historically interacted in the ANF. Substantively, Plaintiffs asserted that the issuance of an NTP was not a "major federal action" that triggered the requirements of NEPA because the Forest Service lacked the regulatory authority over the drilling proposals which it claimed.   Finally, Plaintiffs argued that the Settlement Agreement and Marten Statement had created a *de facto* multi-year drilling moratorium in the ANF that would cause irreparable harm to mineral rights owners, local business entities affiliated with drilling, and the local community surrounding the ANF.

A hearing on Plaintiffs' preliminary injunction motion was conducted between August 24th and August 26th, 2009.   At the hearing, several former ANF employees and officers testified as to the Forest Service's historical practice with respect to privately owned mineral interests.   Ernest Rozelle, a "land staff officer" in the ANF from 1986 to 1999, testified that Minard Run I was "a landmark decision" which provided the Forest Service with a target for completion of their analysis relative to individual drilling requests.   See Minard Run II, 2009 WL 4937785, *8.   Rozelle also testified that the Forest Service had not traditionally applied NEPA to individual drilling requests and that the Service typically processed 90-95% of such requests within 60 days of receipt.   Id. at *8.

Similarly, David Fredley, a mineral specialist in the ANF, and David Wright, the ANF Forest Supervisor from 1987 through 1992, each testified that the Forest Service, during their respective tenures within the ANF, had viewed the 60-day framework set forth in Minard Run I as a commitment between the Service and the private oil and gas industry to process drilling proposals cooperatively and expeditiously.   Id. at *9-10.   This practice was also reflected in the Forest Service's 1984 ANF Handbook which incorporated each element of the Minard Run I framework into its "standard operating procedures."   Id. at *6.

The court also heard testimony at the hearing concerning the impact of the so-called "drilling ban" on private oil and gas interests in the ANF.   Several business owners "testified that, as a result of the Service's ban on new drilling, they were prevented from drilling new wells, causing significant losses to their business and harm to the community."   Minard Run III, 670 F.3d at 246; Minard Run II, 2009 WL 4937785, *15-19.

Former ANF Supervisor Marten and Forest Ranger Anthony Scardina provided testimony in support of the Forest Service's decision to implement a forest-wide drilling ban while conducting an environmental impact study. Scardina testified that the number of drilling proposals received by the Forest Service had increased substantially in recent years, necessitating a new approach to forest management.   Minard Run II, 2009 WL 4937785, *14. Scardina averred that the Forest Service's previous, individualized approach to processing drilling proposals had resulted in unnecessary surface degradation, such as duplicative roadbuilding and facility development, and that the Forest Service intended to utilize the EIS process to gain a more holistic, comprehensive

view of drilling in the ANF.   Id.   Marten testified to her belief that the Forest Service had the authority to halt drilling in the ANF for a lengthy period of time if such a delay was required to carry out the EIS.   Minard Run II, 2009 WL 4937785, *13-14.

On December 15, 2009, this Court issued a memorandum opinion and order enjoining the Forest Service from "requiring the preparation of a NEPA document as a precondition to the exercise of private oil and gas rights in the ANF" and from "[e]nforcement of the forest-wide drilling ban in the ANF."   See Minard Run II, 2009 WL 4937785, *34.   In so doing, we concluded that, with the exception of the County of Warren and the AFA, Plaintiffs had sufficiently demonstrated that they had suffered "actual, concrete, particularized 'injury in fact'" so as to establish the threshold jurisdictional issue of standing.   Id. at *20-21 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Summers v. Earth Island Inst., 555 U.S. 488 (2009)).   We also found that the Settlement Agreement and the Marten Statement represented a "fundamental 'sea change'" in Forest Service policy such that they cumulatively represented final agency action subject to review under the APA.   Minard Run II, 2009 WL 4937785, *22.   Finally, we held that Plaintiffs had satisfied the requisite elements for preliminary injunctive relief by demonstrating that the Forest Service's processing of drilling proposals and issuance of NTPs did not represent "major federal actions" subject to the requirements of NEPA, that the proposed drilling ban would result in irreparable harm to the plaintiffs, and that the balance of equities and the public interest both favored an injunction.   Id. at *32-33.   The Forest Service was ordered to return to processing NTPs "in the same form and

manner in which they had been prior to the inception of the drilling ban and consistent with the procedures set forth in [Minard Run I]."    Id.

On January 12, 2010, Defendants filed a "Motion for Reconsideration or in the Alternative to Alter or Amend Judgment" which asserted several grounds for reconsideration and alternatively requested that the Court "clarify the procedures for processing drilling proposals under the preliminary injunction order." (Memorandum in Support of Motion for Reconsideration or in the Alternative to Alter or Amend Judgment, Dkt. #48, p. 1).   Following a hearing, we denied Defendants' motion for reconsideration but provided the following clarification on the record:

> As has been recognized by all parties, my previous opinion reaffirmed what I referred to as the "Minard Run approach," which included a 60 day notice requirement derived from the holding in the prior Minard Run case. However, my order did not, and was not intended to, grant the drillers carte blanche to enter the ANF and commence drilling operations on the 61st day if unable to reach an accommodation with the Forest Service.  This is because, while my opinion recognized that mineral estates are dominant, it also specifically held that Pennsylvania law requires the owner of the dominant mineral estate to exercise due regard for the servient estate so as to avoid and prevent undue damage to the surface.  I want to make it clear that forbearance on the part of the drillers during the initial 60 day is not in and of itself synonymous with "due regard." Depending upon the unique circumstances of any given case, a period of time longer than 60 days may be entirely appropriate and necessary in order for the dominant and servient estateholders to engage in a meaningful and cooperative accommodative effort.

> If after a good-faith attempt a mutually acceptable accommodation cannot be reached, the Forest Service may, consistent with my previous opinion and, indeed, the action it took in <u>Minard Run I</u>, seek injunctive relief in an appropriate judicial forum to protect the surface estate.

(Order on Motion for Reconsideration, 3/9/2010, Dkt. 59, pp. 8-9).


C.      Defendants' Appeal to the Third Circuit ("<u>Minard Run III</u>")

The Forest Service and the FSEEE Defendants filed interlocutory appeals. In addition to challenging this Court's conclusion that the Settlement Agreement and Marten Statement represented reviewable final agency action, the appellants argued that this Court had erred in failing to recognize the Forest Service's broad authority to regulate private mineral interests on federal land pursuant to the Property Clause of the Constitution, the National Park Service Organic Act, and the Weeks Act. <u>See</u> Brief of Federal Defendants-Appellants, 2010 WL 3216411, *44-46 (2010) ("Forest Service Appellate Brief"); Brief on Behalf of Appellants Forest Service Employees for Environmental Ethics; Allegheny Defense Project; and Sierra Club, 2010 WL 3763764, *28-32 (2010) ("FSEEE Appellate Brief").

On September 20, 2011, the Third Circuit issued a precedential opinion unanimously affirming the preliminary injunction. <u>Minard Run III</u>, 670 F.3d at 243. The Third Circuit characterized the preliminary injunction as enjoining the Forest Service "from requiring the preparation of a NEPA document as a precondition to the exercise of private oil and gas rights in the ANF" and as requiring a "return to the 60-day cooperative framework for processing NTPs that

had been in place prior to the FSEEE Settlement." Id. at 247.   After reviewing applicable property law concerning split estates, the Court held:

> [T]he Service does not have the broad authority it claims over private mineral rights owners' access to surface lands.   Its special use regulations do not apply to outstanding rights and the limited regulatory scheme applicable to the vast majority of reserved rights in the ANF [limiting the Forest Service to "regulations contained in the written instrument of conveyance"] does not impose a permit requirement. Although the Service is entitled to notice from owners of these mineral rights prior to surface access, and may request and negotiate accommodation of its state-law right to due regard, its approval is not required for surface access.   An NTP is an acknowledgment that memorializes any agreements between the Service and a mineral rights owner, but it is not a permit.   Accordingly, in the record before it, the District Court properly concluded that issuance of an NTP is not a "major federal action" under NEPA and an EIS need not be completed prior to issuing an NTP.

Id. at 254.

### D.   Plaintiffs' Contempt Motion

On July 15, 2011, PIOGA filed a motion to hold the Forest Service in contempt of this Court's preliminary injunction order, asserting that the Forest Service had violated the preliminary injunction by (1) refusing to permit PIOGA member Shell Western Exploration and Production, Inc. ("SWEPI") to utilize groundwater located on ANF land in the production of gas contained in Marcellus shale deposits, and (2) "engaging in a pattern of unwarranted and increasing

delays before issuing [NTPs] for private oil and gas developments on split estates." Minard Run Oil Co. v. U.S. Forest Service, 2012 WL 994641, *3 (W.D. Pa. 2012) ("Minard Run IV"). Following a two-day evidentiary hearing, we denied the contempt motion, concluding:

> To prevail on its claim of contemptuous delay, PIOGA must demonstrate by clear and convincing evidence that the manner in which the Forest Service has processed NTPs subsequent to the issuance of the preliminary injunction order violates a clear directive contained therein. As noted above, the central legal issue addressed in that order was whether the exercise of private oil and gas rights in the ANF represented a "major federal action" that triggered the requirements of NEPA. Based on our review of applicable Pennsylvania and federal law, we concluded that the Forest Service lacked sufficient regulatory control over the processing of oil and gas drilling proposals to establish any approval process that would constitute a major federal action requiring NEPA compliance. Consequently, we ordered the Forest Service to return to processing proposals in the "same form and manner in which they had been prior to the inception of the drilling ban" and consistent with Minard Run I. We find, contrary to the Forest Service's contention, that the preliminary injunction order, when viewed against the larger historical backdrop, was clear and unambiguous.

> Historically, approximately 90-95% of the drilling proposals received by the Forest Service were processed within 60 days. Minard Run II, 2009 WL 4937785, *8-9. Delays beyond 60 days were rare and generally were the product of ongoing and amicable negotiations between the Forest Service and the private mineral owners. Id. Thus, a pervasive and persistent pattern of excessive delay beyond the 60-day period in issuing NTPs, after receipt of the requisite Minard Run I information, would violate our preliminary injunction order.

Although the Court is concerned that there is some evidence to suggest that delay has replaced diligence as the hallmark of the Forest Service's processing of drilling proposals, it is important to stress that civil contempt must be proven by clear and convincing evidence.   To reiterate, the clock against which unreasonable delay must be measured does not begin to "tick" until all of the information required by Minard Run I has been supplied.   PIOGA has failed to present clear and convincing evidence as to this critical point and, in contrast, the Forest Service has supplied some credible evidence that the mineral owners have, in various particulars, contributed to the delay in the issuance of NTPs. Consequently, we conclude that PIOGA has failed to carry its burden of proof in support of its contention that the Forest Service has contemptuously violated our order that it process proposals in the "same form and manner in which they had been prior to the inception of the drilling ban."

With respect to the issue of groundwater, we similarly find no basis for a finding of contempt.   Nothing in our December 15, 2009 preliminary injunction order or the Third Circuit's opinion affirming the injunction addressed any issues concerning groundwater usage or the legal status of groundwater within the ANF.   Rather, as previously noted, the central legal issue addressed in the issuance of the preliminary injunction was whether the Forest Service could "require[e] the preparation of a NEPA document as a precondition to the exercise of private oil and gas rights in the ANF."   Minard Run II, 2009 WL 493 7785, *34.   The preliminary injunction order did not address or consider any issues relative to groundwater, much less issue any order regarding the same.   Consequently, the position taken by the Forest Service with respect to SWEPI's proposed groundwater use does not form the basis for a finding of contempt.

Minard Run IV, 2012 WL 994641, at **6-7.

E.    Summary Judgment

On March 5, 2012, Plaintiffs filed a motion for summary judgment requesting an entry of judgment in their favor, conversion of the December 15, 2009 preliminary injunction order into a final declaratory judgment, and a permanent injunction against the Forest Service.   On March 6, 2012, the FSEEE Defendants also filed a motion for summary judgment seeking vacation of the preliminary injunction order and judgment in their favor.   The Forest Service concedes that, from its perspective, all substantive legal issues germane to the propriety of granting the preliminary injunction were addressed and resolved by the Third Circuit.   The Forest Service does contend, however, that a declaratory judgment in favor of the Plaintiffs, rather than conversion of the preliminary injunction into a permanent injunction, is the appropriate final remedy in this case.


## II.   SUMMARY JUDMGENT STANDARD

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."   Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading;

rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.   If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A material fact is a fact whose resolution will affect the outcome of the case under applicable law.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.   Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3rd Cir. 1990).   Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'"   Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3rd Cir. 1990) (quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990)).   The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Company v. Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3rd Cir. 1989) (the non-movant must present affirmative evidence - more than a scintilla but less

than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment).

## III.  DISCUSSION

We begin our analysis by discussing the effect of the Third Circuit's opinion in Minard Run III and the potential application of the law of the case doctrine.  "As most commonly defined, the law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)).  It is well-settled that the law of the case doctrine applies when an appellate court issues a "fully considered appellate ruling on an issue of law made on a preliminary injunction appeal."  Federal Practice and Procedure, § 4478.5 (April 2012); American Civil Liberties Union v. Mukasey, 534 F.3d 181 (3rd Cir. 2008) ("ACLU").  Such a ruling, particularly where it does not depend on the factual record or where the facts are not disputed, "become[s] the law of the case for future proceedings in the trial court on remand and in any subsequent appeal."  Federal Practice and Procedure, § 4478.5.

The Third Circuit comprehensively discussed this principle in ACLU, a case in which various internet content providers and users joined the ACLU in

15

seeking an injunction barring the government from enforcing the newly-enacted Child Online Protection Act ("COPA") on the basis that it violated the First Amendment.   The district court issued a preliminary injunction after determining that there appeared to be less restrictive options available to the government to accomplish the goals of COPA.   On appeal, the Third Circuit affirmed, holding that COPA was "not narrowly tailored to serve the Government's compelling interest in preventing minors from being exposed to harmful material on the Web, was not the least restrictive means available to effect that interest, and was substantially overbroad."   ACLU, 534 F.3d at 186 (citing American Civil Liberties Union v. Ashcroft, 322 F.3d 240, 251-71 (3rd Cir. 2003)).   On remand, the district court entered a permanent injunction barring the government from enforcing COPA and the government again appealed.   Id. at 186.   The Third Circuit began its analysis by discussing the applicability of the law of the case doctrine and "the binding effect that [its] prior decisions on legal issues at the preliminary injunction stage on an earlier appeal in the same case have on later decisions." Id. at 187 (citing Pitt News v. Pappert, 379 F.3d 96, 104-05 (3rd Cir. 2004).

The Court stated:

> Clearly the nature of the showing that an applicant for a preliminary injunction must make to obtain relief can present special difficulties in applying the law-of-the-case doctrine in later stages of the litigation. In Pitt News we noted that "three separate rules are relevant" when considering the effect of a preliminary injunction later in ongoing litigation:

First, it is our Court's tradition that a panel may not overrule 'a holding' of a prior panel. Second, it is well established that neither this tradition nor the law-of-the-case doctrine requires a panel hearing an appeal from the entry of a final judgment to follow the legal analysis contained in a prior panel decision addressing the question whether a party that moved for preliminary injunctive relief showed a likelihood of success on the merits. Third, although a panel entertaining a preliminary injunction appeal generally decides only whether the district court abused its discretion in ruling on the request for relief and generally does not go into the merits any farther than is necessary to determine whether the moving party established a likelihood of success, a panel is not always required to take this narrow approach. If a preliminary injunction appeal presents a question of law and the facts are established or of no controlling relevance, the panel *may* decide the merits of the claim.

Id. at 104–05 (citations and most internal quotation marks omitted).   We explained:

In the typical situation—where the prior panel stopped at the question of likelihood of success—the prior panel's legal analysis must be carefully considered, but it is not binding on the later panel. . . . On the other hand, if the first panel does not stop at the question of likelihood of success and instead addresses the merits, the later panel, in accordance with our Court's traditional practice, should regard itself as bound by the prior panel opinion.

Id. at 105.

ACLU, 534 F.3d at 187-88 (quoting Pitt News, 379 F.3d at 104-05).   Applying

those principles, the Court determined that the law of the case doctrine applied to

several of the specific legal conclusions set forth in its previous ruling:

> In [the previous ruling] we concluded that plaintiffs were likely
> to succeed on the merits and thus concluded that the District
> Court could grant them a preliminary injunction.
> Nevertheless we did not stop our analysis after coming to
> that conclusion.  Instead, we opined at length on the
> constitutionality of COPA and construed a number of terms in
> the statute.  Consequently, the procedural posture of this
> case and the scope of our prior decision has set a foundation
> for the possible applicability of the law-of-the-case doctrine
> here.

Id. at 188.   Finally, the Court acknowledged three "extraordinary circumstances"

which might invite reconsideration of issues that would ordinarily be precluded by

the law of the case doctrine:

> (1) [T]here has been an intervening change in the law; (2)
> new evidence has become available; or (3) reconsideration is
> necessary to prevent clear error or a manifest injustice.
> Council of Alternative Political Parties v. Hooks, 179 F.3d 64,
> 69 (3d Cir.1999) (citing In re City of Philadelphia Litig., 158
> F.3d 711, 718 (3d Cir.1998)).

Id.

These conclusions are consistent with those reached by other federal

circuit courts.   In Naser Jewelers, Inc. v. City of Concord, 538 F.3d 17, 20 (1st

Cir. 2008), for example, a district court's initial denial of a preliminary injunction

was affirmed by the First Circuit on appeal.   The district court then entered

summary judgment against the plaintiff on the basis of the legal determinations made by the First Circuit in affirming the denial of the preliminary injunction.   Id. at 19.   Although that affirmance addressed only a preliminary ruling, the First Circuit held that "the district court correctly relied on [the] prior decision as binding."   Id. at 20.   The Court explained:

> Under these circumstances, the law of the case doctrine applies. Under that doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983); see also, e.g., Commercial Union Ins. Co. v. Walbrook Ins. Co., 41 F.3d 764, 769 (1st Cir.1994). Narrow exceptions to the doctrine exist if the initial ruling was made on an inadequate record or was designed to be preliminary; if there has been a material change in controlling law; if there is newly discovered evidence bearing on the question; and if it is appropriate to avoid manifest injustice. Ellis v. United States, 313 F.3d 636, 647-48 (1st Cir.2002); see also United States v. Moran, 393 F.3d 1, 7 (1st Cir.2004); Cohen v. Brown Univ. ( Cohen II ), 101 F.3d 155, 168 (1st Cir.1996). None of these exceptions apply here.
>
> The doctrine applies in these circumstances even though our prior decision was a denial of a preliminary injunction and this appeal concerns entry of summary judgment. We have held that the doctrine applies when this court has previously ruled on a motion for a preliminary injunction and "the record before the prior panel was 'sufficiently developed and the facts necessary to shape the proper legal matrix we[re] sufficiently clear.' " Cohen II, 101 F.3d at 169 (quoting Cohen v. Brown Univ. ( Cohen I ), 991 F.2d 888, 904 (1st Cir.1993)). Although conclusions regarding preliminary injunctions are "to be understood as statements as to probable outcomes," id. (citing A.M. Capen's Co. v. Am. Trading & Prod. Corp., 74 F.3d 317, 322 (1st Cir.1996); Narragansett Indian Tribe v.

19

> _Guilbert_, 934 F.2d 4, 6 (1st Cir.1991)), "[t]he concern
> informing this caveat arises when we are asked to rule on the
> propriety of a district court's grant of a preliminary injunction
> ... without benefit of full argument and a well-developed
> record," _id._ That situation was not present in this case.

Id. at 20.   See also Gaalla v. Brown, 2012 WL 512687, *5 (5th Cir. 2012) ("We

have held that a decision on interlocutory appeal of the grant of a preliminary

injunction constitutes law of the case as to legal determinations. . . . Decisions in

other circuits mirror our holding that conclusions of law made by a court of

appeals regarding a preliminary injunction become the law of the case, and

binding on that court in future proceedings.") (citing, e.g., ACLU, 534 F.3d at

189-90)); Preminger v. Peake, 552 F.3d 757, 765 (9th Cir. 2008) (holding that the

Court's legal determinations on a prior appeal from a preliminary injunction denial

"remain[] the law of the case"); Ranchers Cattlemen Action Legal Fund v. U.S.

Dep't of Agric., 499 F.3d 1108, 1114 (9th Cir. 2007) (holding that conclusions of

law made on appeal from a preliminary injunction order are binding on a district

court on remand); This That And The Other Gift And Tobacco, Inc. v. Cobb

County, 439 F.3d 1275, 1283-84 (11th Cir. 2006) (concluding that legal rulings

issued by a prior panel on an appeal of a preliminary injunction order were the

law of the case with respect to subsequent proceedings in the same litigation and

describing those rulings as "binding on the district court"); National Hockey

League Players Ass'n v. Plymouth Whalers Hockey Club, 419 F.3d 462, 470-71

(6th Cir. 2005) ("Plaintiffs argued before the district court on remand, and now before this Court, that the determination by the Sixth Circuit [on appeal from the denial of a preliminary injunction] that the OHL market for player services is not an economic market is not binding under the law of the case doctrine because it was made on appeal from a preliminary injunction. We disagree."); Entergy, Arkansas, Inc. v. Nebraska, 241 F.3d 979, 987 (8th Cir. 2001) (holding that the Court's ruling on a legal issue following an appeal from a preliminary injunction "is now the law of the case" as to subsequent proceedings in the litigation); Royal Ins. Co. of America v. Quinn-L Capital Corp., 3 F.3d 877, 881 (5th Cir. 1993) ("We disagree with Quinn-L's suggestion that law of the case principles have no application to an interlocutory appeal of the granting of a preliminary injunction. As in any other interlocutory appeal, our decision constitutes law of the case. Obviously, the doctrine extends only to matters actually decided.   As to decisions of law, the interlocutory appeal will establish law of the case.").

In its decision in Minard Run III, the Third Circuit, as in the ACLU case, "did not stop [its] analysis" after concluding that Plaintiffs were likely to succeed on the merits of their preliminary injunction.   See ACLU, 534 F.3d at 187-88 (quoting Pitt News, 379 F.3d at 104-05).   Rather, the Court expressly declared its intention to comprehensively and decisively resolve the legal claims presented on appeal so as to "facilitate a prompt and efficient resolution of questions

regarding the scope of the Service's authority over private mineral rights in the ANF and its obligations under NEPA." Minard Run III, 670 F.3d at 249. The Third Circuit also emphasized that "[w]hether the Service's moratorium is required by NEPA and the APA are pure questions of law that require no further factual development." Id. Moreover, as in Naser Jewelers, both the preliminary injunction order and the Third Circuit's affirmance had the benefit of "full argument and a well-developed record." Naser Jewelers, 538 F.3d at 20; see also Bowers v. City of Philadelphia, 2008 WL 5234357, *4 (E.D. Pa. 2008) ("Preliminary injunction findings may have preclusive effect 'if the circumstances make it likely that the findings are 'sufficiently firm' to persuade the court that there is no compelling reason for permitting them to be litigated again.'") (quoting Hawksbill Sea Turtle v. FEMA, 126 F.3d 461, 474 n. 11 (3rd Cir. 1997)). Finally, as will be discussed in depth below, many of the arguments raised by the FSEEE Defendants in their motion for summary judgment were directly addressed and resolved by the Third Circuit in Minard Run III.

For the reasons that follow, we conclude that the arguments advanced by the FSEEE Defendants in their motion for summary judgment are precluded by the application of the law of the case doctrine and/or otherwise lack merit. See ACLU, 534 F.3d at 187; Naser Jewelers, 538 F.3d at 20; Gaalla, 2012 WL 512687 at *5.

A.    <u>Success On The Merits</u>

The first step in evaluating a request for a permanent injunction is to "determine if the plaintiff has actually succeeded on the merits (i.e. met its burden of proof)." <u>CIBA-GEIGY Corp. v. Bolar Pharmaceutical Co., Inc</u>., 747 F.2d 844, 850 (3rd Cir. 1984); <u>see</u> <u>also</u> <u>Amoco Prod. Co. v. Village of Gambell</u>, 480 U.S. 531, 546 n. 12 (1987) (noting that a party seeking a permanent injunction must first prove actual success on the merits of their claim).   In granting the preliminary injunction, this Court concluded that Plaintiffs were likely to succeed on their claim that the Settlement Agreement between the Forest Service and the FSEEE Defendants was contrary to law.   On appeal, the Third Circuit "affirmed in all respects" the preliminary injunction opinion.   <u>Minard Run III</u>, 670 F.3d at 243.   The FSEEE Defendants disagree with each of those rulings and contend that they are entitled to judgment in their favor on the merits.   Each of their arguments will be addressed in turn.

1.    The Weeks Act

The FSEEE Defendants first contend that this Court, as well as the Third Circuit, misinterpreted critical portions of the 1911 Weeks Act, 16 U.S.C. §§ 511-521.   In our memorandum opinion granting the preliminary injunction, we

noted, by way of background, that "[t]he 1911 Weeks Act established funding and procedures for acquiring the privately held property interests that became the ANF and other eastern national forests."  <u>Minard Run II</u>, 2009 WL 4937785, *3. We also concluded that, under the Weeks Act, both outstanding and reserved private mineral rights are subject to federal control only to the extent set forth in "rules and regulations . . . expressed in the written instrument of conveyance." <u>Id</u>. (citing 16 U.S.C. § 518).   In that regard, we observed:

> [T]he Weeks Act, by its terms, *restricts* the Secretary's ability to burden the dominant estate to those rules and regulations that are contained in the instrument of conveyance:
>
>> Such rights of way, easements, and reservations retained by the owner from whom the United States receives title, shall be subject to the rules and regulations prescribed by the Secretary of Agriculture for their occupation, use, operation, protection, and administration, *and such rules and regulations shall be expressed in and made part of the written instrument conveying title to the lands to the United States*; and the use, occupation, and operation of such rights of way, easements, and reservations shall be under, subject to, and in obedience with the rules and regulations so expressed. 16 U.S.C. § 518 (emphasis added); <u>see</u> <u>also</u> <u>United States v. Srnsky</u>, 271 F.3d 595, 601-02 (4th Cir. 2001). In other words, "with unmistakable clarity, [the Weeks Act] *does* require that any rules or regulations that the Secretary wishes to apply . . . must be 'expressed in and made part of' the instrument of conveyance." <u>Id</u>. (emphasis in original).
>
> For the vast majority of ANF properties acquired by the federal government prior to 1937, the deeds do not provide

> the Forest Service with the regulatory authority that it
> contends it possesses here.

Id. at *28-29 (emphasis in original).

The FSEEE Defendants assert that this Court and the Third Circuit each erred in failing to consider the legislative history of the Weeks Act which, in their view, lends support to their contention "that the [Forest Service] has sufficient authority to protect the surface lands to allow for review of environmental impacts of oil and gas operations on the public lands." See FSEEE Brief in Support of Summary Judgment, p. 6. Citing various House Reports and Senate Reports, they contend that the primary Congressional purpose underlying the Weeks Act was to acquire land for conservation and protection purposes and, as a result, the Weeks Act should be broadly interpreted as an exercise of "Federal sovereign authority to reasonably regulate that land." Id. at 8 (citing, e.g., S. Rep. No. 459, 60th Cong., 1st Sess. At 7, 11 (1908) (discussing the need for federal protection of natural resources because state and individual actors had failed to adequately protect them); H.R. Rep. No. 1036, 61st Cong., 2d Sess. At 4 (1910) (discussing conservation measures employed in Europe and noting that "Government ownership of a portion of the protective forests of the mountains and government supervision over the balance . . . is the only [conservation plan] that has been entirely successful")). The FSEEE Defendants extrapolate from these general legislative goals the conclusion that Congress intended to grant broad regulatory

25

authority to the Forest Service with respect to all federal land acquisitions pursuant to the Weeks Act. Id. at 16-20. They further contend that Congress, by virtue of the omission of the word "only" from the last provision of Section 9 of the Weeks Act when it was amended in 1913, signaled its intention to significantly expand the federal government's regulatory authority over land acquired pursuant to the Act.[1] See FSEEE Brief in Support of Summary Judgment, pp. 15-16.

_____

[1] As originally enacted, Section 9 of the Weeks Act stated:

> That such acquisition may in any case be conditioned upon the exception and reservation to the owner from whom title passes to the United States of the minerals and of the merchantable timber, or either or any part of them, within or upon such lands at the date of the conveyance, but in every case such exception and reservation and the time within which such timber shall be removed and the rules and regulations under which the cutting and removal of such timber and the mining and removal of such minerals shall be done shall be expressed in the written instrument of conveyance, and thereafter the mining, cutting, and removal of the minerals and timber so excepted and reserved *shall be done **only** under and in obedience to the rules and regulations so expressed*.

16 U.S.C. § 518, Mar. 1, 1911, c. 186, § 9, 36 Stat. 962 (1911) (emphasis added). Following the 1913 amendment, Section 9 stated:

> That such acquisition by the United States shall in no case be defeated because of located or defined rights of way, easements, and reservations, which, from their nature will, in the opinion of the National Forest Reservation Commission and the Secretary of Agriculture, in no manner interfere with the use of the lands so encumbered, for the purposes of the Act; *Provided*, That such rights of way, easements, and reservations retained the by the owner from whom the United States receives title, shall be subject to the rules and regulations prescribed by the Secretary of Agriculture for their occupation, use, operation, protection, and administration, and that such rules and regulations shall be expressed in and made part of the written instrument conveying title to the lands to the United States; and the use, occupation, and operation of such rights of way, easements, and reservations *shall be under, subject to, and in obedience with the rules and regulations so expressed*.

Although the FSEEE Defendants did not raise these precise arguments on appeal, both the Forest Service and the FSEEE Defendants vigorously argued before the Third Circuit that the Weeks Act was not intended to restrict the Forest Service's regulatory authority to only those rules and regulations set forth in the deeds and that the underlying purpose of the Act was preservation and conservation of valuable land resources.   For example, the Forest Service argued that the Weeks Act was passed "for the purpose of conserving the forests and the water supply" and "for the protection of the watersheds of navigable streams," and that the Act reflected "a congressional desire to create one more mechanism to ensure protection of the surface."   <u>See</u> Forest Service Appellate Brief, 2010 WL 3216411, *7, *41-42. The Forest Service also argued that the requirement set forth in Section 9 of the Weeks Act that rules and regulations be expressed in the deed did not represent "the Forest Service's *sole* source of authority over Weeks Act lands."   2010 WL 3216411, *40 (emphasis in original).

The FSEEE Defendants, in turn, argued that, "[i]n interpreting the Weeks Act, the district court incorrectly implied the word "only" where no such word was present."   FSEEE Appellate Brief, 2010 WL 3763764, *34-35.   The Third Circuit

---

16 U.S.C. § 518, Mar. 4, 1913, c. 145, 37 Stat. 828, 855 (1913) (first emphasis in original; second emphasis added).

rejected those arguments and affirmed this Court's conclusion that the Weeks Act

did not provide the Forest Service with the broad regulatory authority it claimed:

> As a preliminary matter, we note that the Service's regulatory authority over Weeks Act land is not as straightforward as it claims. The Organic Act's grant of regulatory authority applies to "the public forests and national forests which may have been set aside or which may be hereafter set aside under section 471 of this title." 16 U.S.C. § 551. Section 471 (now repealed) authorized the President to designate already owned federal lands as national forests, but did not authorize the purchase of private land, including land with reserved or outstanding rights. 16 U.S.C. § 471, *repealed by* Pub.L. 94–579, title VII, § 704(a), 90 Stat. 2792 (1976). When the Organic Act was passed, the regulation of "occupancy and use" did not contemplate the regulation of access by a cotenant.
>
> The Weeks Act was the first law to authorize federal acquisition of private land for forest preservation. It provides that land acquired under the Act "shall be permanently reserved, held, and administered as national forest lands under the provisions of section 471 of this title," 16 U.S.C. § 521. This provision "arguably requires treating such land as if it had been reserved under section 471" and could therefore be subject to the Service's regulatory authority under the Organic Act. United States v. Srnsky, 271 F.3d 595, 601 (4th Cir.2001). However, even if Congress meant by this language to subject Weeks Act land to the Service's regulatory authority under the Act, it intended to authorize the Service to regulate the exercise of reserved or outstanding rights by a joint owner of Weeks Act land.
>
> Indeed, section 9 of the Weeks Act suggests that this was not Congress's intent. Section 9 governs the acquisition of forest land, and provides:
>
> > Such acquisition by the United States shall in no case be defeated because of located or defined rights of way,

easements, and reservations, which, from their nature will, in the opinion of the Secretary of Agriculture, in no manner interfere with the use of the lands so encumbered, for the purposes of this Act. Such rights of way, easements, and reservations retained by the owner from whom the United States receives title, shall be subject to the rules and regulations prescribed by the Secretary of Agriculture for their occupation, use, operation, protection, and administration, and *such rules and regulations shall be expressed in and made part of the written instrument conveying title to the lands to the United States;* and the use, occupation, and operation of such rights of way, easements, and reservations shall be under, subject to, and in obedience with the rules and regulations so expressed.

16 U.S.C. § 518 (emphasis added). Thus, under section 9, reserved rights—"rights of way, easements, and reservations retained by the owner from whom the United States receives title"—are subject to the regulations "expressed in and made part of the written instrument conveying title to the lands to the United States." Id.

The Service points out that nothing in this provision provides that reserved mineral rights are subject *only* to regulations in the instrument of conveyance—it is possible that reserved rights are subject to the Service regulations contained in the written instrument of conveyance *and* to other regulations not contained in the instrument. There are two problems with this interpretation. First, it renders the provision superfluous: Congress would not have mandated the inclusion of regulations in deeds with reserved rights if those rights were subject to all generally applicable Service regulations—the general regulatory authority granted under the Organic Act would have been sufficient. See Massie v. U.S. Dept. of Housing and Urban Dev., 620 F.3d 340, 352 (3d Cir.2010) ("a core tenet of statutory interpretation [is] that no provision shall be superfluous, void, or insignificant") (internal quotation marks omitted); In re Philadelphia Newspapers, LLC, 599 F.3d 298, 307 (3d Cir.2010) (warning against "applying a

general provision when doing so would undermine limitations created by a more specific provision").

Second, as the Fourth Circuit noted in Srnsky, the regulatory authority claimed by the Service "has no logical stopping point" and would therefore raise difficult constitutional questions. 271 F.3d at 604. For example, on the Service's view, it would have the authority to require any holder of reserved rights of any kind—even an easement or right of way—to obtain a permit prior to exercising their rights. This would effectively "wipe the National Forest System clean of any and all easements, implied or express" and dramatically reduce the value of reserved mineral and timber rights. Id. We do not believe that this is what Congress intended, and, like the Fourth Circuit, we are reluctant to construe the Weeks Act " 'in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the takings clause.' " Id. (quoting United States v. Security Indus. Bank, 459 U.S. 70, 82, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982)). The better reading of the Weeks Act is that it "require [s] that any rules or regulations that the Secretary wishes to apply to easements reserved by the grantor must be 'expressed in and made part of' the instrument of conveyance." Srnsky, 271 F.3d at 602.

These considerations apply with even greater force to outstanding rights. Although the Weeks Act contains no limiting language regarding the regulations applicable to outstanding rights, this is because outstanding rights are created prior to conveyance to the United States and there is no opportunity to limit these rights by inserting regulations into the instrument defining these rights. Moreover, the language of the Weeks Act indicates that Congress expected the United States to be bound by the terms of outstanding rights—purchase of land with outstanding rights is permitted only where such rights "from their nature will, in the opinion of the Secretary of Agriculture, in no manner interfere with the use of the lands so encumbered, for the purposes of this Act." 16 U.S.C. § 518. This limitation only makes sense if the Service is bound by the terms of outstanding rights and

> cannot simply invoke its regulatory authority to override any
> private use of outstanding rights that it considers inconsistent
> with the purposes of the Weeks Act. Additionally, as with
> reserved rights, we are reluctant to construe the Weeks Act
> in a manner raising difficult constitutional takings questions
> absent a clear indication of congressional intent.

Minard Run III, 670 F.3d at 251-52 (emphasis in original).

In rejecting the Forest Service and FSEEE Defendants' contention that Congress intended to grant broad regulatory authority to the Forest Service pursuant to the Weeks Act, the Third Circuit explicitly rendered a decision on "a rule of law . . . [that] should continue to govern the same issues in subsequent stages in the same case."   See Arizona, 460 U.S. at 618; ACLU, 534 F.3d at 187-88.   The Court characterized the issues before it as "pure questions of law that require no further factual development" and declared its intent to "facilitate a prompt and efficient resolution of questions regarding the scope of the Service's authority over private mineral rights."   Minard Run III, 670 F.3d at 249.   None of the FSEEE Defendants' arguments relative to their interpretation of the legislative history of the Weeks Act cite any intervening change in controlling law or newly available evidence.   ACLU, 534 F.3d at 188.   Consequently, we conclude that the Third Circuit's clear ruling that the "Service does not have the regulatory authority that it claims under the Organic Act and Weeks Act" is binding at this stage in the litigation.   ACLU, 534 F.3d at 187-88 (quoting Pitt News, 379 F.3d at 104-05); Naser Jewelers, 538 F.3d at 20.

The law of the case doctrine also forecloses another argument advanced by the FSEEE Defendants, to wit, that the Forest Service possesses broad regulatory authority over mineral estates in the ANF because Pennsylvania's legislature specifically consented to such authority.   See FSEEE Brief in Support of Summary Judgment, pp. 32-35.   The scope of Pennsylvania's purported consent to federal regulatory authority is inapposite because, as stated by the Third Circuit, Congress explicitly restricted the federal government's ability to regulate private mineral estates to the terms of those rules and regulations which are contained in the instruments of conveyance (with respect to reserved mineral estates) or by the terms of outstanding rights created prior to federal acquisition. Minard Run III, 670 F.3d at 251-52.   Moreover, quite independent of the law of the case doctrine, the FSEEE Defendants' argument fails on the merits.   As they note in their summary judgment brief, the 1911 Weeks Act authorized land acquisition for national forests "for the purpose of preserving the navigability of navigable streams" only upon consent of individual state legislatures.   See 16 U.S.C. § 515.   In May, 1911, Pennsylvania passed a bill titled "Allowing the United States to Acquire Land" which granted authority to the United States to acquire the land that would eventually become the ANF.   32 P.S. § 101.   That bill contained language authorizing the federal government to pass laws that "in its judgment may be necessary for the management, control, and protection of

such lands acquired" pursuant to the Weeks Act.   32 P.S. §§ 102-103. However, the federal government explicitly chose *not* to acquire private mineral estates when it acquired the surface estates that comprise the ANF, and the 1911 Pennsylvania Act contains no language authorizing the federal government to pass regulatory laws concerning unacquired mineral estates.

2.      The Property Clause and <u>Kleppe</u>

The FSEEE Defendants next contend that this Court and the Third Circuit erred by failing to recognize that, pursuant to the Property Clause of the United States Constitution and the United States Supreme Court's decision in <u>Kleppe v. New Mexico</u>, 426 U.S. 529 (1976), Congress has broad powers to enact legislation to reasonably regulate private land adjacent to (or underlying) federal property.   <u>See</u> FSEEE Brief in Support of Summary Judgment, pp.20-28.   In <u>Kleppe</u>, the state of New Mexico challenged the authority of the federal government to enact the Wild Free-roaming Horses and Burros Act, a piece of legislation designed to regulate wildlife on federally-owned public lands, contending that it represented "an impermissible intrusion on the sovereignty, legislative authority, and police power of the State and have wrongly infringed upon the State's traditional trustee powers over wild animals."   <u>Kleppe</u>, 426 U.S. at 541.   The Supreme Court disagreed, noting that, "while the furthest reaches of

33

the power granted by the Property Clause have not yet been definitely resolved, we have repeatedly observed that '[t]he power over the public land thus entrusted to Congress is without limitations.'"   Id. at 543-44 (quoting United States v. San Francisco, 310 U.S. 16, 29 (1940)).   The Court concluded that the Wild Free-roaming Horses and Burros Act was a valid exercise of Congressional power under the Property Clause rather than "an impermissible intrusion upon state sovereignty."   Id. at 543-44.   Relying on Kleppe, the FSEEE Defendants contend that the Forest Service's ability to regulate private mineral estates underlying federal property is similarly "without limitations."   See FSEEE Brief in Support of Summary Judgment, pp. 21-26.

The FSEEE Defendants' suggestion that the Third Circuit "virtually ignored" their arguments concerning Kleppe and the Property Clause is refuted by the Third Circuit's discussion of those precise arguments in Minard Run III.   In their appellate brief, the FSEEE cited Kleppe for the proposition that "Congress has the power under the property clause to regulate federal land" and to "regulate conduct on or off federal land which affects federal land."   FSEEE Appellate Brief, 2010 WL 3763764, * 28-29 (citing Kleppe, 426 U.S. at 539).   Similarly, the Forest Service argued that, "[u]nder the Property Clause of the Constitution, Congress has broad authority to regulate private conduct occurring on or off federal lands that affects public lands."   Forest Service Appellate Brief, 2010 WL

3216411, *34-35 (citing <u>Kleppe</u>, 426 U.S. at 539).   The Third Circuit expressly noted that each of the Defendants had raised arguments based upon the Property Clause.   <u>See</u> <u>Minard Run III</u>, 670 F.3d at 250 ("The Service points out that Congress has broad authority under the Property Clause of the Constitution to regulate land owned by the federal government as well as use of private land that affects federal land.") (citing <u>Kleppe</u>, 426 U.S. at 540).   The Court ultimately rejected each of those arguments.   <u>Id</u>. at 254 ("In sum, the Service does not have the broad authority it claims over private mineral rights owners' access to surface lands.").   Once again, no exception to the application of the law of the case doctrine applies, with the result being that the Third Circuit's rejection of the FSEEE Defendants' arguments relative to the effect of <u>Kleppe</u> and the Property Clause is preclusive.


3.      Remaining Issues

Several other assertions raised by the FSEEE Defendants are similarly precluded by the Third Circuit's decision in <u>Minard Run III</u> or substantively lack merit.   For example, the FSEEE Defendants contend that our preliminary injunction order and the Third Circuit's opinion in <u>Minard Run III</u> impermissibly create a "two-tiered national forest system."   FSEEE Brief in Support of Motion for Summary Judgment, p. 30.   Specifically, they argue that Section 1609(a) of

the National Forest Management Act of 1976, 16 U.S.C. §§ 1600-1614, mandates that all national forest lands must be regulated uniformly by the Forest Service, regardless of the language of the specific statutes pursuant to which national forest land was acquired.   The basis for their contention is § 1609(a)'s general declaration that "the National Forest System consists of units of federally owned forest, range, and related lands throughout the United States and its territories, united into . . . one integral system."   16 U.S.C. § 1690(a).   However, that contention conflicts with the Third Circuit's holding that the Forest Service's regulatory authority over national forest land depends upon the legislation pursuant to which the land is acquired.[2]   See Minard Run III, 670 F.3d at 253 (distinguishing the Eighth Circuit's decision in Duncan Energy Co. v. United States Forest Service, 50 F.3d 584 (8th Cir. 1995), on the basis that "the land at issue in Duncan I was not acquired under the Weeks Act, but under [the Bankhead-Jones Farm Tenant Act], which does not contain the limiting language of the Weeks Act discussed above."); see also Burlison, 533 F.3d at 435 ("The government cites cases in which our sister circuits determined that the federal government has authority to regulate [under various federal acts]. . . . None of

---

[2]      In any event, it is evident from the text of § 1609(a) that the purpose of this subsection was to "supply . . . a general definition of the term . . . National Forest System," see Montana Wilderness Ass'n, Nine Quarter Circle Ranch v. U.S. Forest Service, 655 F.2d 951, 954 (9th Cir. 1981), rather than to supplant the regulatory limitations contained in each distinct federal land acquisition statute, including the Weeks Act, in favor of a grant of uniform regulatory authority on behalf of the Forest Service.

these cases . . . are determinative because they all involve statutes that differ in significant respects from the Refuge Act.").

The FSEEE Defendants also contend that this Court and the Third Circuit each erred in failing to appropriately defer to the Forest Service's legal conclusion that NEPA applies to the processing of drilling applications in split-estates on federal lands.   See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984); Skidmore v. Swift & Co., 323 U.S. 134 (1944).   Pursuant to Chevron, "agency action promulgated in the exercise of congressionally-delegated authority to make rules carrying the force of law" is entitled to deference if it represents a "reasonable interpretation" of a statute. De Leon-Ochoa v. Attorney General of U.S., 622 F.3d 341, 348-49 (3rd Cir. 2010) (citing Chevron, 467 U.S. 837; United States v. Mead Corp., 533 U.S. 218, 226-27 (2001)).   "Agency action that does not qualify for Chevron deference may still deserve a lesser amount of deference under [Skidmore]."   Skidmore, 323 U.S. at 140.   The FSEEE Defendants suggest that a 2007 legal opinion authored by an attorney in the Department of Agriculture provided a "fully explained" and reasonable basis for the Forest Service's decision to apply NEPA to the issuance of NTPs.   See FSEEE Brief in Support of Motion for Summary Judgment, pp. 48-52.   This contention was rejected by the Third Circuit and is now the law of the case:

> The Service's construction of the Weeks Act and the Organic Act as conferring regulatory authority over outstanding rights is not entitled to deference. This interpretation was adopted in a 2007 General Counsel opinion (J.A. 380–83 & n.5), not in a formal adjudicatory or rulemaking proceeding, and thus is not entitled to <u>Chevron</u> deference. <u>See</u> <u>De Leon–Ochoa v. U.S. Att'y Gen.</u>, 622 F.3d 341, 348–49 (3d Cir.2010) (citing <u>United States v. Mead Corp.</u>, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). Even <u>Skidmore</u> deference is unwarranted here, because the Service's current interpretation is an unexplained departure from its longstanding view that its regulations do not apply to outstanding mineral rights. <u>See</u> <u>Wyeth v. Levine</u>, 555 U.S. 555, 129 S.Ct. 1187, 1201, 173 L.Ed.2d 51 (2009).

<u>Minard Run III</u>, 670 F.3d at 252 n. 9.

Finally, with respect to reserved rights, the FSEEE Defendants assert that both Courts erred in determining that the majority of the deeds that conveyed the land comprising the ANF surface to the federal government did not contain language authorizing broad federal regulation.  As previously noted, "[r]eserved rights are those reserved by the fee owner in the deed conveying surface ownership to the United States."   <u>Minard Run III</u>, 670 F.3d at 243.   Reserved rights "are categorized by the set of Secretary of Agriculture Rules and Regulations in effect at the time of federal acquisition and are typically referred to as 1911, 1937, 1947 or 1963 reserved rights."   <u>Minard Run II</u>, 2009 WL 4937785, *3.  Following the evidentiary hearing on the preliminary injunction motion, we concluded, on the basis of evidence submitted at the hearing, that the "vast majority of the reserved mineral estates in the ANF are '1911 reserved

rights'" which "typically incorporate [the] standard seven paragraph version of rules adopted by the Secretary of Agriculture in 1911" and "do not require a 'permit' for 'surface use, occupancy or disturbance.'"   Id. at **3-4 (citing Mayer Decl., ¶ 37; 1984 ANF Handbook, Ch. 1, p. 3; Ch. 2, p. 14; U.S. Forest Service July 2009 ANF Draft SEIS, p. 1); see also Minard Run III, 670 F.3d at 243 ("About 48% of the mineral rights in the ANF are reserved rights and the vast majority of these are 1911 rights . . .").[3]

---

3       The "standard seven paragraph version" of the 1911 rules provides as follows:

> 1. Every person claiming the right to prospect for minerals, oil or gas, or the products thereof, or to mine, drill, develop or operate in or upon lands acquired by the United States under the provisions of the Act of March 1, 1911 (36 Stat. 961), with a reservation to the grantor of mineral rights, including oil and gas, must, on demand, exhibit to the Forest Officer in charge satisfactory written evidence of the right or authority from, through or under the said grantor.

> 2. In prospecting for, and in mining and removing minerals, oil and gas, and in manufacturing the products thereof, only so much of the surface shall be occupied, used or disturbed as is necessary for the purpose.

> 3. In underground operations all reasonable and usual precaution shall be made for the support of the surface and to that and tunnels, shafts and other working shall be subject to inspection and examination by the Forest Officers, Mining Experts or Inspectors of the United States.

> 4. Payment of the usual rates charged in the locality for sales of National Forest timber, and timber products of the same kind or species shall be made to the United States for all timber, undergrowth or young growth, cut, destroyed or damaged in prospecting, mining, drilling or removing minerals, oil or gas, or in manufacturing products therefrom, and in the location and construction of buildings or works of any kind for use in connection therewith. All slash resulting from such cutting or destruction shall be disposed of as directed by the Forest Officer, when inflammable in his judgment. No timber, undergrowth or reproduction shall be unnecessarily cut, destroyed or damaged.

The FSEEE Defendants challenge this finding on two primary grounds. First, they contend that there is insufficient evidence to support this Court's finding that the seven paragraph version of rules is the "standard" version in the ANF.   They suggest, without evidentiary support, that many of the deeds which conveyed the ANF surface to the federal government might contain other versions of the 1911 rules that could arguably allow for more regulatory control by the Forest Service.   <u>See</u> FSEEE Brief in Support of Motion for Summary Judgment, pp. 54-55.   However, the Administrative Record ("AR") submitted by the Forest Service provides "7 Examples of Deeds" on "1911 Reserved Rights" that were "Randomly Pulled" from the Forest Service's files, and each contains the aforementioned seven paragraph version of the 1911 rules.   <u>See</u> AR 13907,

---

5. All buildings, camps, equipment and other structures shall be removed from the Forests within six months after the completion or abandonment of the operations, otherwise such buildings, camps, equipment and other structures shall become the property of the United States.

6. All destructible refuse caused by the operations hereunder, which interferes with the administration of the forest growth shall, within six months after the completion of said operations, be disposed of.

7. While operations are in progress, the operators, contractors, subcontractors and employees of contractors and subcontractors at work on the National Forest shall use due diligence in the prevention and suppression of fires, and shall be available for service in the extinguishment and suppression of all fires within the particular locality.

<u>Minard Run II</u>, 2009 WL 4937785, **3-4.

13926, 13933, 13941, 13952, 13963, 13976, 13986.   Moreover, as noted by the Third Circuit, Plaintiffs' "expert opined without contradiction that the seven-section version of the 1911 regulations considered by the District Court . . . was the 'standard version.'"   Minard Run III, 670 F.3d at 254 n. 12 (concluding that this Court "did not commit clear error in finding that 1911 rights "typically" incorporated the standard version of the 1911 regulations").

Secondly, the FSEEE Defendants contend that even those deeds which contain only the standard 1911 rules and regulations still provide "authority to the government to regulate the manner of and impacts from access to the surface." FSEEE Brief in Support of Motion for Summary Judgment, pp. 52-53.   However, the Third Circuit has already determined as a matter of law that the 1911 rules and regulations contained in the ANF deeds do not provide the federal government with the broad regulatory authority claimed by the FSEEE Defendants.   See Minard Run III, 670 F.3d at 243 ("The 1911 regulations were quite minimal, and generally required mineral rights owners to use no more of the surface than reasonably necessary, pay for any timber cut down when clearing space for wells, take appropriate measures to prevent fire, and remove all facilities or refuse when drilling operations cease" and "did not require mineral rights owners to obtain a permit").   This determination is now the law of the case and is binding.

In sum, we conclude, for the reasons set forth herein, that the Plaintiffs have established that the Settlement Agreement is contrary to law. Consequently, Plaintiffs have demonstrated their entitlement to declaratory relief as set forth in the accompanying order.

B.    Request for Permanent Injunction

As stated above, Plaintiffs have succeeded on the merits of their claim and are entitled to declaratory relief.   The Forest Service does not object to conversion of the preliminary injunction order into a final declaratory judgment on the merits.   See Federal Defendants' Memorandum Regarding Remedy, Dkt. # 109, p. 5.   However, the Forest Service challenges the need for permanent injunctive relief on the basis that a declaratory judgment will provide an adequate remedy to Plaintiffs, that Plaintiffs are not currently suffering irreparable harm, and that the balance of the equities and the public interest each disfavor issuance of a permanent injunction.

The standard for granting a permanent injunction is essentially the same as for granting a preliminary injunction, except that a party seeking a permanent injunction must prove actual success on the merits rather than merely demonstrating a likelihood of success.   Amoco, 480 U.S. at 546 n. 12.   Thus, a party seeking a permanent injunction must establish:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, LLC, 547 US. 388, 391 (2006) (citing, e.g., Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-313 (1982)).   The "decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court."   eBay, 547 U.S. at 391.   Thus, "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."   Weinberger, 456 U.S. at 313.   In deciding whether a permanent injunction should be issued, a court first "must determine if the plaintiff has actually succeeded on the merits (i.e. met its burden of proof)" and then, if so, "consider the appropriate remedy."   CIBA, 747 F.2d at 850.

It is well established that, before issuing a permanent injunction, a court must consider whether any other remedies at law are adequate.   Weinberger, 456 U.S. at 311-312 (holding that a permanent injunction "is not a remedy which issues as a matter of course" and is only appropriate "to protect property rights against injuries otherwise irremediable.") (quoting, e.g., Harrisonville v. W.S. Dickey Clay Mfg. Co., 289 U.S. 334, 337-38 (1933); Cavanaugh v. Looney, 248 U.S. 453, 456 (1919)).   The Supreme Court has "repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and

43

the adequacy of legal remedies."   Id. (quoting Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 61 (1975)).   After careful consideration, we conclude that declaratory relief provides an adequate remedy at this stage of the litigation.

The recent United States Supreme Court decision in Monsanto v. Geertson Seed Farms, 130 S.Ct. 2743, 2756 (2010), is instructive.   In Monstanto, environmental groups and conventional alfalfa seed farmers filed an action challenging a governmental agency's decision to deregulate a crop known as Roundup Ready Alfalfa (RRA) without first preparing an EIS.   The district court vacated the agency's decision and issued a permanent injunction against any planting of RRA pending the agency's completion of a detailed environmental review.   On appeal, the Supreme Court held that the vacatur of the agency's decision was sufficient to redress the injuries alleged and, consequently, the "drastic and extraordinary remedy of a permanent injunction" was not warranted. Id. at 2761 (noting that the "injunction against planting does not have any meaningful practical effect independent of . . . vacatur.").

Here, the harm suffered by Plaintiffs stemmed directly from the "Forest Service's decision to halt drilling while an EIS was performed."   Minard Run II, 2009 WL 4937785, *32.   As in Monsanto, entering a permanent injunction against the Forest Service would "not have any meaningful practical effect" beyond the relief granted by the vacatur of the Settlement Agreement.

<u>Monsanto</u>, 130 S.Ct. at 2761.   Simply put, a permanent injunction against further implementation of the Settlement Agreement is unnecessary because the drilling ban has already been lifted by virtue of the preliminary injunction entered on December 15, 2009, and any attempt by the Forest Service to reinstate the drilling ban would be precluded by the terms of the declaratory relief awarded herein.   Moreover, as a result of the return to the "status quo of <u>Minard Run</u>" occasioned by the elimination of the drilling ban, the balance of equities and public interest no longer favor injunctive relief.   <u>See</u> <u>Minard Run II</u>, 2009 WL 4937785, *33.


## IV.  <u>CONCLUSION</u>

For the reasons set forth herein, Plaintiffs' Motion for Summary Judgment is granted and the FSEEE Defendants' Motion for Summary Judgment is denied. Plaintiffs' Motion for a Permanent Injunction is denied.   An order will be issued reflecting that the April 8, 2009 Settlement Agreement between the Forest Service and the FSEEE Defendants is hereby vacated and this Court's Memorandum Opinion of December 15, 2009, is converted into a final declaratory judgment on the merits.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MINARD RUN OIL COMPANY,　　　　　)
PENNSYLVANIA OIL AND GAS　　　　　)
ASSOCIATION, ALLEGHENY FOREST　)
ALLIANCE, and WARREN COUNTY,　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　　　　)
　　　v.　　　　　　　　　　　　　　　　)　　C.A. No. 09-125 Erie
　　　　　　　　　　　　　　　　　　　)　　Judge McLaughlin
UNITED STATES FOREST SERVICE,　)
*et al.*,　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　　　　)

**ORDER**

AND NOW, this 6th day of September, 2012, for the reasons set forth in the accompanying Memorandum Opinion:

1.　　Plaintiffs' Motion for Summary Judgment is GRANTED;

2.　　The FSEEE Defendants' Motion for Summary Judgment is DENIED;

3.　　Plaintiff's Motion for Permanent Injunction is DENIED;

4.　　The April 8, 2009 Settlement Agreement between the Forest Service and the FSEEE Defendants is hereby VACATED; and

5.　　This Court's Memorandum Opinion and Order of December 15, 2009, is converted into a final declaratory judgment on the merits.


IT IS SO ORDERED.

　　　　　　　　　　　　　　　/s/ - Sean J. McLaughlin
　　　　　　　　　　　　　　　United States District Judge

cm:　　All parties of record.